765 So.2d 1002 (2000)
Lawrence DUPREE
v.
CITY OF NEW ORLEANS and Sewerage and Water Board of New Orleans.
No. 99-C-3651.
Supreme Court of Louisiana.
August 31, 2000.
Rehearing Denied October 27, 2000.
*1005 Robert Elton Arceneaux, Mack E. Barham, Travis Louis Bourgeois, Mary Elizabeth Dromgool Paltron, Camille LeVois Richard, Barham & Arceneaux, New Orleans, for Applicant.
Patrick G. Kehoe, Jr., Madeleine M. Landrieu, New Orleans, Michael D. Riley, Jay Christopher Zainey, Metairie, Birdsall, Rodriguez, Kehoe & Riley, for Respondent.
KNOLL, Justice.[*]
This case involves a single-vehicle accident caused by a large cave-in on a street in New Orleans. On May 26, 1994, the plaintiff, Lawrence Dupree, Sr. ("Dupree") was operating his pick-up when he struck the cave-in and lost control of his vehicle causing him to suffer severe, permanent, and disabling injuries. The trial court rendered judgment in favor of the plaintiff and against the Sewerage & Water Board ("S & WB"), finding it 100% at fault. The Fourth Circuit Court of Appeal affirmed, concluding that the actions and inactions of the S & WB caused the accident and resulting injuries to Dupree. We affirm, concluding that the S & WB is liable for plaintiff's injuries because of its legal fault arising out of a thing in its custody or garde that had a vice or defect that presented an unreasonable risk of harm to the motoring public and that defect was the cause-in-fact of Dupree's damages.

FACTS
On May 26, 1994, Dupree was operating his 1994 Mitsubishi pick-up traveling northbound on Gordon Street in New Orleans, Louisiana. At around 7:30 p.m., the weather was clear, it was still daylight, and the street was dry. Dupree struck a large cave-in or depression filled with water on Gordon Street, near the intersection of North Robertson Street. In unrefuted *1006 testimony, Dupree testified that as he was traveling at approximately twenty miles per hour, he noticed water in the street that looked like a puddle. The water completely filled the cave-in and concealed its true width and depth. Dupree also stated that he had no prior notice of the cave-in because no barricades were present to warn motorists of the dangerous condition. Upon hitting the cave-in, both of the pick-up's front tires fell into the hole causing Dupree's vehicle to go out of control, bouncing up and down as it traveled through the cave-in. As a result, Dupree was thrown such that his head hit the top of his vehicle, compressing his cervical spine, breaking three vertebrae, and causing immediate quadriplegia. Dupree then slumped over to the passenger side of his truck and fell to the floor of the truck. His truck eventually came to a stop after it knocked down a fence and hit a parked vehicle in a yard. Mr. Oliver Bush, an eyewitness to the accident, corroborated Dupree's testimony. Mr. Bush further testified that he waved at Dupree as he approached the cave-in, apparently in an attempt to warn him of the dangerous condition.
The testimony from the residents of the neighborhood where the accident occurred established that the cave-in was large, measuring approximately five feet wide, five feet long, and two feet deep, and was constantly filled with water. One resident, Ms. Loretta Eugene, testified that the cave-in was large enough for her to lie down in completely.[1] The testimony also established that the cave-in had been in the street for several months.[2] All of the residents testified that there was no barricade at the cave-in on the date of the accident. Mr. Bush testified that he walked past the intersection everyday on his way to work and had never seen any barricades at the cave-in before the accident, but did see the S & WB place barricades at the cave-in after the accident. Officer Hunter, the investigating police officer, corroborated this testimony describing the cave-in as a very large, very deep pothole filled with water. He approximated its diameter at five feet. Officer Hunter also testified that his investigation revealed that there were no barricades at the cave-in on the date of the accident. He also testified that this area of the City was his regular patrol area and that he never saw a barricade at this location.

PROCEDURAL HISTORY
Dupree filed suit and initially named the City of New Orleans ("City") as the sole defendant. Subsequently, Dupree, represented by new counsel, filed a second lawsuit naming the City and the S & WB as defendants. Dupree then dismissed his first attorney and consolidated the two actions. The case was tried by judge over four days. On the first day of trial, the City filed a motion for summary judgment. Neither the S & WB nor Dupree filed an objection to the motion and the court granted the City's motion, finding it free of liability and dismissing it from the lawsuit.[3] The trial court denied S & WB's exception of no cause of action and held S & WB liable assessing it with 100% fault. The trial court reasoned that regardless of whether the City was ultimately responsible *1007 for repairing the cave-in, the S & WB undertook the duty to protect the public from harm when it chose to barricade the cave-in. The trial court found that the S & WB breached its duty when it failed to safely barricade the cave-in either by failing to place any barricades around the cave-in, as testified by all the plaintiffs witnesses, or by placing only one barricade around the cave-in, as the S & WB contended. The trial court concluded that, given the size of the hole and the danger it posed to the public, multiple barricades were required. The trial court awarded Dupree $2,000,000.00 in general damages, $79,630.87 in past medical expenses, $153,605.00 in future medical expenses, and $2,513,889.00 in future attendant care, for a total award of $4,747,134.87.
S & WB suspensively appealed the judgment, asserting several assignments of error. The appellate court found no merit to any of the assignments of error and affirmed the trial court. Dupree v. City of New Orleans, 99-0620 c/w 99-0621 (La. App. 4 Cir.9/29/99), 745 So.2d 77. The court of appeal, extensively quoting the trial court's reasons for judgment, found that the record clearly supported the trial court because regardless of whether the S & WB facilities caused the cave-in, the S & WB nonetheless had the duty to place adequate warnings at the cave-in to protect the public from harm. We granted the S & WB's writ of certiorari to review the judgments of the lower courts. Dupree v. City of New Orleans, 99-3651 (La.3/24/00), 757 So.2d 645, 2000 La. LEXIS 961.

LAW and ANALYSIS

S & WB LIABILITY
The S & WB argues that because it eventually determined that the cave-in was not caused by any S & WB facilities and notified the City of the problem after the accident and because the City owns Gordon Street and repaired the cave-in, then the S & WB should be absolved from any liability in this matter.[4]
Under Louisiana law, liability for injuries sustained by one as the result of a defective condition of a thing is based on legal fault, i.e., strict liability. See LA. CIV.CODE art. 2317.[5] Louisiana's codal provision for legal fault is found in LA. CIV. CODE art. 2317 which provides:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of *1008 persons for whom we are answerable, or of the things which we have in our custody....
In an action asserting liability under LA. CIV.CODE art. 2317 before 1996, the plaintiff bore the burden of proving three elements: (1) that the thing which caused the damages was in the care, custody, and control (garde) of the defendant; (2) that the thing had a vice, ruin, or defect that presented an unreasonable risk of harm; and (3) that the vice, ruin, or defect was the cause-in-fact of the plaintiffs damages. LA. CIV.CODE art. 2317; Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990); Loescher v. Parr, 324 So.2d 441 (La.1975).[6] To recover, plaintiff bears the burden of proving these elements in the affirmative, and the failure on any one is fatal to the case. We must therefore determine if the lower courts erred in determining that S & WB was strictly liable for plaintiffs damages.
The S & WB does not contest that the cave-in on Gordon Street was the cause-infact of Dupree's damages. However, it vigorously contests whether Gordon Street at the location of the cave-in was in its care, custody, and control (garde) and whether it presented an unreasonable risk of harm. The S & WB contends that it owed no duty to the plaintiff and did not assume any duty to the public by its gratuitous act of placing a barricade at the scene. It also asserts that if it owed a duty, it did not breach that duty because the placing of one barricade at the location of the cave-in was reasonable under the circumstances. The plaintiff argues that the S & WB is liable because even if it did not create the dangerous condition, it had the care, custody, and control of Gordon Street at the location of the cave-in on the date of the accident and it failed to act reasonably under the circumstances.
Turning to the first element, we find the record supports the conclusion that the thing that caused plaintiffs damages, i.e., the cave-in, was in the care, custody, and control (garde) of the S & WB. It is well-settled law in Louisiana that liability under LA. CIV.CODE art. 2317 is based upon the relationship, i.e., supervision and control, between the person with custody and the thing posing an unreasonable risk of harm to others. Liability is imposed based on custody or garde, not just ownership. Thumfart v. Lombard, 613 So.2d 286, 290 (La.App. 4 Cir.), writ denied sub nom., Montalbano v. Lombard, 617 So.2d 1182 (La.1993). The fault of the custodian is based upon his failure to prevent *1009 the thing under his garde from causing an unreasonable risk of injury to others. Loescher, 324 So.2d at 441; Entrevia, 427 So.2d at 1146. Rather than the loss falling upon some innocent third person, the loss resulting from the creation of the risk falls upon the person to whom society allots its garde. Id. The rationale is the custodian is in a better position than the innocent victim to detect, evaluate, and take steps to eliminate an unreasonable risk of harm which arises from the thing. King v. Louviere, 543 So.2d 1327 (La. 1989); Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987).
Determining who has the custody or garde of the thing is a fact driven determination. Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La. 1991). Moreover, because Article 2317 imposes liability upon persons for things in their custody or garde, a principle much broader than ownership, it is clear that more than one party may have custody or garde of a thing under LA. CIV.CODE art. 2317, determined by an examination of the parties' actions and relationships to the thing causing the injury. King, 543 So.2d at 1329-30 (discussing dual garde and noting that under appropriate circumstances the custody or garde of a thing may be divided between two persons); Ehrman v. Holiday Inns, Inc., 94-0312 (La.App. 4 Cir.3/29/95), 653 So.2d 732, 738 (stating that "[m]ore than one party may have custody and control or garde under La. C.C. 2317"); Thumfart, 613 So.2d at 289-90 & n. 4 (concluding that dual garde may exist under LA. CIV.CODE art. 2317 and liability of the nonowner is determined by his own actions and relationship to the thing causing the injuries); see also MARAIST & GALLIGAN, LOUISIANA TORT LAW § 14-5, at 341 & n.51 (discussing dual garde). The person who has custody or garde of a thing is he who has the legal duty to prevent its vice or defect from harming another. King, 543 So.2d at 1328.
In attempting to define a test for determining who has custody or garde of a thing, we have set forth several general principles to assist the trier-of-fact. Most notably we have stated that in determining whether a thing is in one's custody or garde, courts should consider (1) whether the person bears such a relationship as to have the right of direction and control over the thing; and (2) what, if any, kind of benefit the person derives from the thing. Doughty, 576 So.2d at 464; King, 543 So.2d at 1329; Loescher, 324 So.2d at 449 n. 7.
With these principles in mind, we now turn to the record evidence to determine if the S & WB had garde of the area in question on the date of the accident.
Josie Smith, a resident of Gordon Street who lived two houses down from the intersection of North Robertson and Gordon, contacted the S & WB on April 14, 1994, to report a hole in the street with a leak. Based on the complaint, the S & WB opened service request # 49096.[7] That same day, the S & WB sent an inspector out to investigate the problem. Upon inspection, the S & WB inspector reported that there was a water leak[8] in the main and opened work order *1010 # XXXXXXXXXX, dated April 14, 1994, which was forwarded to the Pressure Systems Department.[9] The Pressure Systems Department sent a truck to the location on May 22, 1994.[10] On May 23, 1994, Mr. Renz, who noted the possible water main leak on April 14, returned to the cave-in. The S & WB again returned to the cave-in on May 24, 1994, two days before the accident. On this date, Eston Cazelot, employed by the S & WB as a Utility Maintenance Foreman in the Gravity Complaint Department, testified that under his direction the Gravity System Department investigated the cave-in. Mr. Cazelot testified that there was one barricade sitting down in the cave-in when they arrived. On this date, S & WB performed a dye test to detect if there was a broken drain or sewer line.[11] The results of the test were negative. Finally, the S & WB sent Mr. Robert Oalmann to the cave-in on May 25, 1994, the day before the accident to reset the barricade.
The record shows that S & WB employees had been at the location of the cave-in either to inspect or test its facilities under the cave-in or to reset the barricade for approximately six weeks before the accident, with most of the activity on the four days preceding the accident. On May 27, 1994, the day after the accident, Mr. Becker sent an interoffice memorandum to Rick Hathaway, the City's Street Maintenance Supervisor, referring the problem to the Street Department. The Street Department received the letter on May 31, 1994. The memorandum indicated that there was a problem at the intersection of North Robertson and Gordon and that the S & WB's investigation revealed that there was a depression in the street. The memorandum also requested that the Street Department advise the S & WB when the work was completed at the location.
Accordingly, we conclude that at the time of this accident, S & WB's relationship was clearly such that it had the sole right of direction and control over Gordon Street at the location of the cave-in. The undisputed evidence on this issue is over-whelming.
We now turn to whether the S & WB derived any benefit from the area in question. The history of the S & WB shows that it was created to avoid a repetition of malaria, typhoid, and yellow fever epidemics that plagued the city of New Orleans, the state of Louisiana, and the entire South in the late Eighteenth Century. See JOY J. JACKSON, NEW ORLEANS IN THE GILDED AGE: POLITICS AND URBAN PROGRESS, 1880-1896 (2d ed.1997); see also State ex rel. Porterie v. Walmsley, 162 So. 826, 842, 183 La. 139 (1935) (discussing the history of the S & WB). Public awareness of the urgent need for proper sewerage disposal, *1011 pure drinking water, and adequate drainage was highlighted in 1897 with the outbreak of a yellow fever epidemic that claimed nearly 300 victims. Jackson, supra, at 101. These contagious diseases were caused by germs and insects bred and propagated because of improper drainage, inadequate and faulty sewerage disposal, and contaminated drinking water common at the turn of the century. Id. The prevalence of these maladies caused general quarantines, paralyzing public and private business, and causing public loss. Id. at 101-02, 581. New Orleans was particularly vulnerable to such contaminations due to its flat topography, sea-level elevation, and poor drainage. Id. at 100.
To avoid further repetition of the diseases, on June 5, 1899, the city of New Orleans taxpayers adopted an amendment to the State Constitution, levying a two-mill tax upon real estate and requiring that it should apply one-half of the surplus arising from the one percent debt tax during a period of forty-two years to the development of the sewerage, water, and drainage systems in New Orleans. Id. at 578. To carry out this constitutional amendment, the Legislature passed 1899 La. Acts 6, thereby creating the S & WB and charging it with the responsibility of the water supply and sewerage disposal for New Orleans.
Act 6 authorized the S & WB to furnish, construct, operate, and maintain a water treatment and distribution system and a sanitary sewerage system for New Orleans. In 1903, the New Orleans Drainage Commission was merged with the S & WB to consolidate all of the city's drainage, water, and sewerage facilities under a single agency to fulfill its goals of providing the citizens of New Orleans with adequate drainage, sewerage collection, and drinking water. See New Orleans: Let Us Look ... (visited July 1, 2000 ) .
To carry out the directives of Act 6, the Legislature codified the S & WB's duties and responsibilities in our Revised Statutes. Thus, LA. R.S. 33:4071 provides that the S & WB is statutorily responsible for the efficient administration, construction, control, maintenance, and operation of the City of New Orleans' public water, public sewerage, and public drainage systems. The New Orleans City Code supplements LA. R.S. 33:4071, providing that: "The powers, duties and functions of the Sewerage and Water Board are provided by applicable state and municipal law. The Board shall coordinate its repair, maintenance, and construction projects with City agencies, including the City Planning Commission and the Departments of Public Works and Parks and Parkways, in order to minimize disruption of the City's streets, sidewalks, and other public spaces." New Orleans City Code Ch. 3, § 5-302. As noted in King, a very important consideration in determining whether a person has garde of a thing is found in the policy established by related statutes. King, 543 So.2d at 1329.
The record reveals how the S & WB carries out its statutory responsibility. Mr. Becker, a S & WB superintendent, testified that it is a policy among all of the City's utilities that if one utility discovers a defective location, that utility will barricade the location and make it safe until it notifies the proper utility and until that utility responds to address the problem. He further stated that it is the policy of the S & WB that when its employees come upon a defect in the street and until it can be determined whose problem is it, the S & WB will barricade the area and make it safe for the public. This intragovernmental arrangement affords the S & WB the means to fulfill its statutory duties, prevents duplication of services by allowing the S & WB time to investigate whether one of its utilities is causing the problem before the City's Streets Department patches the hole, and minimizes the disruption of the City's streets. Further, this arrangement prevents the wasting of the City's services and resources as a street cannot be properly patched if there is a *1012 water leak because such a condition prevents the asphalt from settling properly and will erode away any patch work, creating the hole again. If the S & WB discovers that its facilities are not causing the problem and that the condition is the responsibility of the Street Department, Mr. Becker stated that S & WB's policy is to continue to maintain the barricades at the defective location until the Streets Department can mobilize and fix the problem.
From this we conclude that the S & WB clearly derived a benefit, indeed a substantial benefit, from its custody of the location of the cave-in on the date of the accident as such custody allowed it to fulfill its statutory responsibilities to ensure its utilities were properly working, prevented the duplication or waste of services, minimized the disruption of the City's streets, and allowed the S & WB to fulfill its intragovernmental responsibilities.
Considering S & WB's actions and relationship to Gordon Street at the location of the cave-in and finding that the S & WB exercised the sole right of direction and control over the cave-in and derived a benefit from that custody on the date of the accident, we conclude that the S & WB did have the care, custody, and control (garde) of the area in question. To hold otherwise and accept S & WB's argument would be to rewrite article 2317 to impose liability solely for the ownership of a defective thing rather than liability arising out of custody of the thing. Doughty, 576 So.2d at 464.
The second element that the plaintiff must prove is that the thing had a vice, ruin, or defect that presented an unreasonable risk of harm. Article 2317 does not impose liability on the custodian for all damage resulting from any risk imposed by the thing. Celestine v. Union Oil Co. of Cal., 94-1868 (La.4/10/95), 652 So.2d 1299, 1303. Rather, the plaintiff must prove that the vice or defect of the thing is a condition which poses an unreasonable risk of harm to others. Id.; Entrevia, 427 So.2d at 1149. The custodian is absolved from his strict liability neither by his ignorance of the defect or vice, nor by circumstances that the defect could not easily be detected. Entrevia, 427 So.2d at 1149. Whether a risk is unreasonable is "a matter wed to the facts" and must be determined in light of the facts and surrounding circumstances of each particular case. Celestine, 652 So.2d at 1304.
There is no fixed rule for determining whether the thing presents an unreasonable risk of harm. To assist the trier-of-facts, we note that many factors are to be considered and weighed, including: (1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved. See Boyle v. Board of Supervisors, L.S.U., 96-1158 (La.1/14/97), 685 So.2d 1080; Langlois v. Allied Chem. Corp., 258 La. 1067, 249 So.2d 133, 140 (1971) ("The activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations."); see also King, 543 So.2d at 1328-29. However, we have cautioned that the trier-of-fact cannot apply the unreasonable risk criterion mechanically. Entrevia, 427 So.2d at 1146; Landry v. State, 495 So.2d 1284 (La.1986). This criterion is a concept employed to symbolize the judicial process of reaching an intelligent and responsible decision and deciding which risks the codal obligations encompass from the standpoint of justice and social utility. Celestine, 652 So.2d at 1299; Entrevia, 427 So.2d at 1146.
Not every imperfection or irregularity creates an unreasonable risk of injury. Further, the fact that an accident occurred because of a vice or defect does not elevate the condition of the thing to *1013 that of an unreasonably dangerous defect. See Shipp v. City of Alexandria, 395 So.2d 727, 729 (La.1981). The vice or defect must be of such a nature as to constitute a dangerous condition that would be reasonably expected to cause injury to a prudent person using ordinary care under the circumstances. Id. When harm results from the defect of a thing that creates an unreasonable risk of harm to others, a person legally responsible under these code articles for the supervision, care, or guardianship of the thing may be held liable for the damages caused. Loescher, 324 So.2d at 446. Liability arises from his legal relationship to the thing, i.e., whether he has custody, care, and control, and his failure to prevent the thing for which he is responsible from causing an unreasonable risk or injury to others. Id.
The trial court determined that the lack of adequate warning of the cave-in created a hazardous condition because its true depth and size was masked by the water. That is, the trial court found the cave-in, combined with the failure to provide adequate warning, presented an unreasonable risk of harm to the motoring public. As such, it held S & WB strictly liable for plaintiff's injuries. Our review of the record, in its entirety, supports the trial court's findings of fact and evaluations of credibility as reasonable. We find that the court was not manifestly erroneous or clearly wrong in its holding.
We conclude that under the circumstances of this case, the cave-in presented an unreasonable risk of harm to the plaintiff and the motoring public. It is the duty of one with custody or garde of a thing presenting an unreasonable risk of harm to properly and adequately label, mark, or barricade places in that site so as to provide adequate and reasonable warning to persons using the area. Carr v. Boh Bros. Const. Co., 557 So.2d 356, 358 (La. App. 4 Cir.1990); Toledano v. Sewerage & Water Bd. of City of New Orleans, 95-1130 (La.App. 4 Cir.3/14/96), 671 So.2d 973, 976 (holding that the S & WB had the duty to properly mark or barricade work sites under its custody and control that present an unreasonable risk of harm to the public); see also Warfield v. Fink & McDaniel Plumbing & Heating, 203 So.2d 827, 830 (La.App. 4 Cir.1967) (holding that the S & WB had a duty to give proper warning of the existence of dangerous conditions at a construction site under its custody and control either by barricade or other reasonable manner).
S & WB's own policies are such that if it has custody of a defective location on a street requiring the use of barricades, the S & WB will continue to maintain the barricades at the defective location until the Department of Streets can mobilize and fix the problem.[12] Clearly, S & WB was in a better position than the innocent victim to detect, evaluate, and take steps to eliminate the defect or to keep the thing in control such that it does not present an unreasonable risk of harm to others. Doughty, 576 So.2d at 461.
It is not seriously disputed that the utility of Gordon Street at the time of the accident was outweighed by its hazardous condition and presented an unreasonable risk of harm to the motoring public. All of S & WB's employees who testified admitted that a cave-in measuring five feet by five feet in diameter with a two-foot drop would require more than one barricade to reasonably protect the public. Mr. Oalmann testified that he would have protected the public by using four barricades and protective tape. Mr. Becker testified that he would have used multiple barricades to make the area safe and that one barricade was not enough for a hole four feet wide. Mr. Cazelot testified that when he went to the site on May 24, 1994, two *1014 days before the accident, he found a large hole and one barricade sitting down in the hole. He stated that a five-foot wide hole would be a dangerous hole and would require multiple barricades. While he could not recall the size of the cave-in, he admitted that if a five feet by five feet cave-in had only one barricade warning the public, safety policy would require that S & WB employees place additional barricades around the cave-in or fill it with sand to "make it safe enough until the Street Department can do whatever they have to do." The work orders and service requests indicate that the S & WB knew of this problem as early as April 14, 1994, and had inspectors, foremen, or employees at the site on April 14, and May 22, 23, 24, and 25, 1994. The record reveals that as a matter of safety policy, S & WB's trucks carry several barricades allowing its employees to take reasonable measures to protect the public adequately when they find a dangerous condition. Moreover, if not enough barricades are on the truck to barricade properly, S & WB employees can radio the yard for additional barricades to be brought to the location or can retrieve the barricades themselves. Each of these S & WB employees had the opportunity and means, with minimal cost and effort, to place multiple barricades at the dangerous condition without adversely affecting the utility of the street and failed to do so.
The record shows that Dupree was a prudent person exercising ordinary care under the circumstances and using Gordon Street for its intended purpose. While Dupree admitted to seeing what he described as a puddle, the water masked the cave-in's true hazardousness by concealing its true width and depth. No signs, warnings or indicators, drew his attention to or notified him to be wary of the cave-in.
The cost of preventing this accident was minimal as all of the S & WB employees carried barricades on their trucks or could have called for barricades. Moreover, the financial burden resulting from the finding of strict liability creates the incentive to warn the motoring public of unreasonable risk of harms such as this one. Clearly, it was S & WB's failure to exercise reasonable care that presented an unreasonable risk of harm to the motoring public which caused this tragic accident.
We conclude that the record clearly supports that Dupree proved that the cave-in was in the custody or garde of the S & WB, that it had a defect that presented an unreasonable risk of harm, and that this defect was the cause-in-fact of his damages. S & WB is therefore liable for its legal fault in causing Dupree's injuries.

COMPARATIVE FAULT OF DUPREE
The S & WB assigns as an error the trial court's failure to assign a percentage of fault to Dupree.[13] We have *1015 reviewed the record and conclude that the trial court was not manifestly erroneous or clearly wrong in finding that Dupree did not act negligently. In any action for damages, the trier-of-fact must determine the percentage of fault of all persons causing or contributing to the damage, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, or whether that person's identity is not known or reasonably ascertainable. LA. CIV.CODE art. 2323(A). If a person suffers damage as the result partly of his own negligence and partly because of the fault of another person or persons, the trier-of-fact must reduce the amount of damages recoverable in proportion to the percentage of negligence attributable to the person suffering the damage. LA. CIV. CODE art. 2323(A). The allocation of fault among all negligent parties applies to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability. LA. CIV.CODE art. 2323(B).
The trier-of-fact is owed great deference in its allocation of fault. Even if the reviewing court would have decided the case differently had it been the original trier of fact, the trial court's judgment should be affirmed unless manifestly erroneous or clearly wrong. Clement v. Frey, 95-1119 c/w 95-1163 (La.1/16/96), 666 So.2d 607, 610. In determining percentages of fault, this Court has stated that the trier-of-fact must consider both the nature of the conduct of all parties and the extent of the causal relationship between the conduct and the damages claimed. We have outlined five factors that may influence the degree of fault assigned: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances that might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967, 974 (La.1985).
We find that the record supports that the trial court was not manifestly erroneous or clearly wrong in finding Dupree free of fault. Plaintiff was clearly unaware of the unreasonably dangerous condition presented by the cave-in. While motorists are charged with a duty of reasonable care to maintain a careful lookout, observe any obstructions present, and exercise care to avoid them, Sinitiere v. Lavergne, 391 So.2d 821, 826 (La.1980), they have a right to assume that the roadway is reasonably safe for use until they know, or should know, of an existing hazard. In unrefuted testimony, Dupree testified that while traveling down Gordon Street at twenty miles per hour, he noticed in the street what appeared to be a puddle of water. He stated, and all of the residents of the neighborhood and the investigating officer confirmed, that he had no warning of the existence of the large cave-in before the accident. The weather was clear, it was still daylight, and the street was dry. Further, Mr. Bush testified that driving past the cave-in without a tire hitting it was not possible. There is no evidence *1016 that Dupree's conduct created any risk to his or other's safety.
We note that the trial court did not resolve whether there was one barricade at the cave-in as urged by the S & WB or no barricade as urged by the plaintiff and corroborated by the witnesses and investigating officer. The trial court resolved this issue by observing in its reasons for judgment:
This court finds that whether no barricades were employed, or only one as asserted by the defendants, the Sewerage and Water Board breached its duty to safely barricade the hole. Again, the Court relies on the testimony of Mr. Joseph Becker who testified that if the hole was as big as described by the independent witnesses called by the plaintiff, or as big as described by the defendant's witness, Mr. E.J. Cazelot, multiple barrels and/or barricades were required as a matter of good safety practice. In fact, the Sewerage and Water Board had notice that one barricade would not be sufficient at this site when Ron Ohlman [sic] was sent to the location on May 25, 1994 in order to repair or replace the barricade as he indicated on his work order.
We do not find that the trial court's resolution of this issue was clearly wrong or manifestly erroneous.
The conduct of the S & WB in failing to exercise reasonable care and safely place adequate warnings of the dangerous condition in its custody to protect the public from harm, which could have prevented the damage, created an unreasonable risk of harm to the public. All of the S & WB employees who were present at the site over the six-week period had the means to adequately and reasonably warn the public of the unreasonably dangerous condition. Considering the capacities of the S & WB and Dupree, the S & WB was clearly in a superior position to the plaintiff, an innocent victim, to detect, evaluate, and take steps to eliminate the defect or to keep the thing in control such that it provided adequate warning to the public of the unreasonably dangerous condition.
We find that the S & WB failed to prove that the plaintiff knew or should have known that Gordon Street was unsafe because of a cave-in presenting an unreasonably dangerous condition. There is simply no evidence that Dupree was negligent. See King, 747 So.2d at 202 (holding the S & WB 100% at fault for a plaintiffs physical injuries and property damages where the plaintiff was injured when he hit a deep hole in Canal Street in New Orleans that S & WB failed to properly barricade). Under these circumstances, we find no abuse of discretion by the trial court's refusal to allocate any fault to Dupree as his damages were not the "result partly of his own negligence." LA. CIV.CODE art. 2323(B). This finding is well supported by the record and is not manifestly erroneous or clearly wrong.

DECREE
For the foregoing reasons, the judgment of the court of appeal affirming the trial court's judgment in favor of the plaintiff and against the Sewerage & Water Board finding it 100% at fault is affirmed.
AFFIRMED.
LEMMON, J., concurs and will assign reasons.
VICTORY, J., dissents and assigns reasons.
MARCUS, J., dissents for reasons assigned by VICTORY, J.
VICTORY, J., dissenting.
Although I do not agree that the S & WB had garde of the 5'×5' pothole, the majority appears to say there was dual garde, yet refuses to attribute any fault to the City who owns the street, unquestionably had the legal responsibility to protect the public from and to repair the huge *1017 pothole[1], and was not required to have notice of the pothole to be held liable.[2] Yet, in my view, the evidence cited by the majority that the hole had existed for months before the S & WB first was contacted about the hole clearly shows that the City, through its employees (police, etc.), had to know of the pothole long before the S & WB first became involved, and should have placed and maintained barricades until the hole was repaired, including the time when the S & WB was testing for leaks.
That the plaintiffs failed to oppose the City's motion for summary judgment, and thus allowed the City to erroneously escape a judgment against it due to finality, is no reason to now impose 100% liability against the S & WB. If the City were still a party, the bulk, if not all, of the fault for this accident would clearly be assigned to the City.
For all of the above reasons, I respectfully dissent.
NOTES
[*] Traylor, J., not on panel. See Rule IV, Part 2, § 3.
[1] Ms. Eugene testified that she was five feet four inches tall.
[2] Ms. Josie Smith testified that the cave-in had been in the street for about five months. Mr. Bush testified that the cave-in had been in the street for a couple of months. Mr. Joseph C. Smith testified that the cave-in had been in the street for several years on and off as it would be patched and would routinely return. He testified that the last time it was repaired was about one year before the accident.
[3] Although the parties agree that the City was dismissed from the suit, the record does not contain either the City's motion for summary judgment or a judgment of dismissal. Nonetheless, a reading of the transcripts supports the conclusion that the City's motion for summary judgment was granted the first day of trial and was not opposed by either the S & WB or the plaintiff. See R. Vol. II, at 8. Neither party sought review of that judgment.
[4] The S & WB did not assign as an error in the court of appeal its argument on excessive damages. Instead, for the first time in this Court, S & WB argues that the trial court's damage award was unreasonable. We find the record confirms that plaintiff's award of damages was not excessive. As a consequence of the accident, Dupree was rendered a quadriplegic. The trial court's total award of $4,747,134.87 was well supported by the uncontradicted testimony of plaintiff's expert. The S & WB presented no expert testimony regarding plaintiff's injuries, future and past medicals, or future attendant care. We find the award in his favor was not excessive and the trier of fact did not abuse its much discretion in making the award. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1977).
[5] We have noted before that the sole distinction between the burden of proof necessary to recover under a negligent action based on LA. CIV.CODE arts. 2315 versus a strict liability action based on LA. CIV.CODE art. 2317 was that in the former the plaintiff had the additional burden of proving the defendant's scienter, i.e., that the defendant "knew or should have known" of the defect. See, e.g., Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 n. 7 (La.1990); Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). Evidence that the risk of harm was unknown or not foreseeable, or that the defendant had acted with reasonable care was irrelevant. Entrevia v. Hood, 427 So.2d 1146, 1148 (La. 1983). LA. CIV.CODE art. 2317.1, added in 1996, eliminated that distinction. See FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW § 14-2, at 330-32 (1996) (noting that "[b]y requiring knowledge or constructive knowledge under Article 2317.1, the Legislature effectively eliminated strict liability under Article 2317, turning it into a negligence claim"). Because this accident occurred in 1994 prior to the legislative change which affected LA. CIV.CODE art. 2317 by the 1996 enactment of new LA, CIV.CODE art. 2317.1, we will analyze this case under the prior law.
[6] We recognize that La. R.S. 9:2800 requires actual or constructive notice of the defect as a prerequisite to claims against public entities such as the S & WB for damages caused by the condition of things within its care and custody. Thus, in order to prove public entity liability for a thing, the plaintiff must establish: (1) custody or ownership of the defective thing by the public entity; (2) that the defect created an unreasonable risk of harm; (3) that the public entity had actual or constructive notice knowledge of the defect; (4) that the public entity failed to take corrective action within a reasonable time; and (5) causation. We take judicial notice, however, that in Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14 this Court held that La. R.S. 9:2800 was a substantive change in the law because it altered the government's duty under LA. CIV.CODE art. 2317. The constitutionality of this statute was called into question as an abrogation of sovereign immunity contained in Article XII, § 10(A) of the Louisiana Constitution. Effective November 23, 1995, that constitutional provision was amended to allow the Legislature to limit the liability of public entities, including the circumstances giving rise to liability. La. R.S. 9:2800 was reenacted, effective that same date, by 1995 La. Acts No. 828. This Court concluded that prior to the November 23, 1995 effective date of the amendment, the statute was an impermissible legislative act in direct conflict with Article XII, § 10(A)'s unequivocal waiver of sovereign immunity and was unconstitutional. Id. Because the re-enactment of the statute was a substantive change in the law, we found that La. R.S. 9:2800 could not be applied retroactively.

In the case sub judice, the accident took place on May 26, 1994, prior to the effective date of re-enacted La. R.S. 9:2800. As such, La. R.S. 9:2800 is not applicable and Article 2317's legal fault principles, unmodified by La. R.S. 9:2800, will govern our resolution of this case.
[7] When a complaint is called into the S & WB, a service request is opened. The service request indicates the time and date the complaint is received, the general nature of the complaint, and the name of the complainant. A S & WB inspector is then assigned to investigate the complaint and is sent to the location. The inspector's findings are recorded on the service request. Based on these findings, the problem could be reported to the property owner or another utility if the inspector determines that the problem is not with the S & WB's facilities. However, if the inspector determines that there is a possible problem with S & WB's facilities, the inspector then opens a work order directed to the appropriate department within the S & WB.
[8] Unresolved from this record is how water was constantly present in the cave-in or why the S & WB reported a break in the water main on April 14, 1994, if in fact there was no malfunction in any of its facilities. A resolution to these questions, however, is unnecessary for our resolution of this case.
[9] A work order is generated if the inspector finds a possible defect with one of the S & WB's utilities. Based on the inspection, the work order is sent to either the Gravity System Department or the Pressure System Department. The Gravity System Department is responsible for the sewer and drainage mains, while the Pressure System Department is responsible for water mains. The appropriate department then sends a crew with a foreman to the location of the reported problem to further investigate the problem and to perform any needed repairs.
[10] The record does not reflect what the findings of the Pressure Systems Department were or what actions it took at the location.
[11] As Mr. Cazelot explained, the Gravity Systems Department performs a dye test by taking a spike and making several holes in the street. Then, the hole is filled up with water and observed to see if the water will go down. If the water goes down, the Department will then put dye into more water and try to catch the dye in the manholes. The Department checks the sewer main hole or drain main hole, whichever is closer, to see if and where dye may be coming out. If dye is seen, that is a positive indication that the line running underneath the hole is broken. If the Department employees cannot get water to go down, that is an indication that there is nothing wrong with any of the S & WB's drain or sewer facilities. However, the test does not determine if there is a broken water line, as that is the responsibility of the Pressure Systems Department.
[12] This intragovernmental policy is not new to the S & WB. See for example Armstrong v. City of New Orleans, 539 So.2d 1000, 1003 (La.App. 4 Cir.1989), where a S & WB employee testified that in furtherance of public safety, the S & WB will place its barricades at dangerous holes in the street, even if some other entity is responsible for repairing it.
[13] The S & WB argues, for the first time in this Court, that the lower courts erred in failing to apportion fault to a phantom, third party tortfeasor. The determination and allocation of comparative fault are factual inquiries that will not be disturbed absent manifest error or unless the court was clearly wrong. Marshall v. A & P Food Co. of Tallulah, 587 So.2d 103 (La.App. 2 Cir.1991). To the extent that a party defendant seeks to have the benefit of comparative fault of another as an affirmative defense, LA.CODE CIV. P. art. 1005, it bears the burden of proof by a preponderance of the evidence that the other party's fault was a cause-in-fact of the damage being complained about. Id.; see also LA.CODE CIV. P. art. 1812 (providing that "[i]f appropriate under the facts adduced at trial, whether another party or nonparty ... was at fault,") (emphasis added). The record does not contain such a level of proof by defendants in relation to any phantom, third party tortfeasor. This assignment is meritless.

S & WB also argues that the lower courts erred in failing to assign the City a percentage of fault. The City filed a motion for summary judgment seeking its dismissal from the suit. Both the plaintiff and the S & WB agreed to informal service and setting of the motion. Neither the plaintiff nor the S & WB filed a written objection to the City's motion. On the first day of the trial, the trial court took-up the City's motion for summary judgment, dismissing it from this suit. Both parties acknowledged in open court to the trial court that they had no objection to the motion or the order dismissing the City from the case with prejudice. The trial court granted the City's motion for summary judgment and dismissed all of the claims against the City with prejudice. Neither party sought review of that judgment.
Notwithstanding the fact that the City's judgment of dismissal was a final, appealable judgment from which no appeal was sought within the time fixed by law, we conclude that the trial court did not err in its assignment of fault. Given S & WB's custody and control of the area in question, its intragovernmental duties, and the evidence adduced at trial, we conclude that the trial court was not manifestly erroneous or clearly wrong in failing to allocate a percentage of fault to the City since S & WB did not prove by a preponderance of the evidence that the City's fault was a cause-in-fact of Dupree's damages. This assignment is likewise meritless.
[1] The City is not relieved of its legal duty to maintain its streets in a safe condition for use by the public simply because another agency undertakes an investigation of a defect on a street to determine if it is legally responsible for correcting the defect. The only exception is perhaps where that agency turns out to be responsible for correcting the defect. In fact, in all the cases relied upon by the majority for its finding that the S & WB had the duty or properly and adequately label, mark and barricade the site, it was the S & WB that actually created the dangerous condition. See Carr v. Boh Bros. Const. Co., 557 So.2d 356 (La. App. 4 Cir.1990) (contractor hired by S & WB caused pipe to break); Toledano v. Sewerage & Water Bd. of City of New Orleans, 95-1130 (La.App. 4 Cir.3/14/96), 671 So.2d 973 (S & WB dug 12 foot hole that caused damage); Warfield v. Fink & McDaniel Plumbing & Heating, 203 So.2d 827 (La.App. 4 Cir.1967) (S & WB created hole by removing sidewalk and excavating a trench).
[2] The trial court granted the City's motion for summary judgment because it found that "the City of New Orleans had no prior notice of the alleged dangerous pothole prior to the accident in question, as required by R.S. 9:2800 et seq." However, majority opinion expressly holds that R.S. 9:2800 does not apply to this case because of our recent decision in Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14 (holding that the knowledge requirement of La. R.S. 9:2800 altered the government's duty under La. C.C. art. 2317 an as such was an abrogation of the government's sovereign immunity contained in Article XII, § 10(A) and could not therefore be applied retroactively to any case prior to November 23, 1995), making the trial court's dismissal of the City on those grounds clearly wrong.