846 So.2d 837 (2003)
Mel McDANIEL
v.
CARENCRO LIONS CLUB, et al.
No. 02-1244.
Court of Appeal of Louisiana, Third Circuit.
March 12, 2003.
Writ Denied June 27, 2003.
*838 Nolan Edwards, E. Byrne Edwards, Lafayette, LA, for Plaintiff/Appellant: Mel McDaniel.
John W. Penny, Jr., Penny and Hardy, Lafayette, LA, for Defendants/Appellees: Lafayette City-Parish Consolidated Government, Division of Arts and Culture, Carencro Lions Club, Royal Insurance Company of America.
George J. Armbruster III, Voorhies and Labbe, Lafayette, LA, for Defendant/Appellee: Lafayette City-Parish Consolidated Government, Division of Arts and Culture.
John S. Thibaut, Jr., Thibaut, Thibaut and Vogt, L.L.P., Baton Rouge, LA, for Defendant/Appellee: John Gullett and/or John Gullett d/b/a Global Telemedia, Inc. and/or John Gullett d/b/a J.G. Enterprises, Inc.
Court composed of SYLVIA R. COOKS, BILLIE C. WOODARD and BILLY H. EZELL, Judges.
*839 COOKS, Judge.

STATEMENT OF THE CASE
Mel McDaniel sued the Lafayette City-Parish Consolidated Government (the City), the Carencro Lions Club, John Gullett and Royal Insurance Company of America for injuries sustained when he fell seven feet from the stage of the Heymann Performing Arts Center onto the concrete floor of the orchestra pit. Trial on the merits was held on June 3, 4, and 5, 2002 before the Honorable Patrick Michot. At the close of plaintiff's case, the trial court granted Motions for Involuntary Dismissal and Directed Verdict in favor of all defendants, finding Mr. McDaniel was solely at fault in causing the accident. Mr. McDaniel filed this appeal presenting two issues for our review: (1) whether he presented a prima facie case that the uncovered, unlit orchestra pit was an unreasonably dangerous defect and whether the City had actual or constructive knowledge of the defect; (2) whether the trial court erred in prohibiting him from presenting testimony of Fabian Patin, an expert in architecture and lighting. For the reasons assigned below, we reverse the judgment of the trial court.

STATEMENT OF THE FACTS
The relevant facts of this case are not in dispute. The accident occurred during the "Grand Ole Opryland Show," a fund-raising event hosted by the Carencro Lions Club. The Lions Club received information about Mr. John Gullett, a professional promoter, who had been successful in handling fund-raising events for other charitable organizations. Mr. Gullett was contacted by a Lions Club officer and agreed to promote a country music revue. The Lions Club signed a contract with Mr. Gullett and authorized him to take whatever action was necessary on behalf of the Lions Club to promote the event. Mr. Gullett contracted with country music singer/songwriter Mel McDaniel to provide entertainment for the "Grand Ole Opryland Show" and leased the Heymann Performing Arts Center from the Lafayette City-Parish Consolidated Government for the evening of November 14, 1996.
The Heymann Performing Arts Center is an auditorium style performing arts theater. Built in 1960, it has a stage elevated four feet from the floor of the auditorium and an orchestra pit, immediately in front of the stage. The floor of the orchestra pit is recessed seven feet below the floor of the stage. A three-foot concrete wall encircles the pit, protecting the audience from the recessed area. The distance from the edge of the stage to the concrete wall, marking the end of the pit, is approximately seven feet. The stage is accessible to the audience by two sets of stairs located on either side. The stairs do not have guard rails.
Prior to renovations in 1987, a row of raised footlights delineated the edge of the stage from the beginning of the orchestra pit. The renovations removed the footlights as unnecessary and added electrical outlets which are flush with the stage floor. At the time Mr. Gullett leased the Heymann Performing Arts Center an orchestra pit cover was available. In fact, the lease agreement signed by Mr. Gullett with the Heymann Performing Arts Center contains the following language:
ORCHESTRA PIT COVER available upon advance request at $100.00.
However, unless the cover was specifically requested by a lessee, the pit remained uncovered and, during performances, a strip of white tape was used to mark the edge of the stage from the seven-foot drop off. Mr. Gullett did not request *840 that the cover be placed on the orchestra pit.
On the evening of November 14, 1996, during Mr. McDaniel's concert, a technical problem developed with the sound equipment. Mr. McDaniel stopped his performance and began to converse with the audience. He stated he could not see the audience. The auditorium lighting technician turned up the house lights approximately fifty percent. At this point, Mr. McDaniel, as was his custom, decided to hand out guitar picks and bandanas to members of the audience and began to walk forward, toward the audience and the orchestra pit. As Mr. McDaniel walked toward the open orchestra pit, "the follow spot technician" swung the spotlight back on Mr. McDaniel in an attempt to warn him of impending danger. Someone else shouted out a warning. It was too late. A stunned audience watched Mr. McDaniel fall seven feet from the stage of the Heymann Performing Arts Center onto the concrete floor of the uncovered orchestra pit. It is clear from the video tape Mr. McDaniel was completely unaware of the drop off. His stride toward the pit was unbroken and he walked, without hesitation, off the stage into the orchestra pit. An ambulance was called and Mr. McDaniel was rushed to Lafayette General Hospital where it was determined he sustained severe injuries to his back, neck, head, shoulder, arms and knees. The record indicates he has incurred considerable medical expenses as a result of the accident.
Mr. McDaniel's fall into the uncovered pit was not the first at the Heymann Performing Arts Center. From 1983 to 1998 there were nine reported accidents involving persons falling into the open orchestra pit. The first reported accident occurred on May 26, 1983 when a gentleman was ascending the stairs to the stage, lost his balance, fell into the orchestra pit and died. Since 1983, approximately every eighteen months, an individual is injured from a fall into the uncovered orchestra pit. The victims include patrons, performers and City employees and the accidents occur in different ways. Some individuals fall from the unguarded stairs; some are auditorium technicians who inadvertently back into the pit; some are local performers who misjudge the edge of the stage during a performance. The accidents at the Heymann Performing Arts Center involving the orchestra pit were no secret. City officials clearly recognized the hazard presented by the uncovered orchestra pit and its potential liability to individuals injured as a result of falling into the pit. The City's knowledge of the risk was evidenced in several documents, the first of which is titled "City of Lafayette Internal Safety Audit Memorandum" dated August 21, 1989 from Pat Roy, Risk Management/Safety to Frank Bradshaw. The memorandum provides:
Prior to renovations and reopening of Heymann Center in January 1989, there have been four accidents with individuals falling into orchestra pit. One was a private citizen, and this accident resulted in death of individual. The other three accidents involved City employeesone of which turned into a workman's comp case, and the other two being somewhat minor in nature.
Since the auditorium reopening at beginning of 1989, there have been two separate cases of individuals falling into orchestra pit. Both cases involved private citizens, a nine-year old boy and a twenty-year old girl. Individuals' injuries were injured right forearm and sprained left wrist. Both of these cases have been closed.

From the auditorium's very beginning in 1960 until now, there has never been *841 a reported injury of any member of a professional performing or theatrical group falling into orchestra pit. One would, therefore, begin to conclude that the professional entertainer is always conscious of where the edge of a stage is and always aware of an existing orchestra pit.

But since the auditorium in Lafayette is also used by local people for such things as dance reviews, Mardi Gras pageants, etc., what can we do to reduce our liabilities with the non-professional using the stage area.
Referring to the attached photographs, areas of concern are top three stairs leading onto stage and the edge of the stage itself. A fall from these areas is about a seven-foot drop to the bottom of the orchestra pit. In the front of the orchestra pit is a short wall, or "people barrier". Quite obviously, a rail protector or barrier can't be installed on pit side of top stair steps, nor on stage edge because of obstruction of audience viewing.
The following choices offered for your consideration when orchestra pit is not being used, maintain a safety factor consistency but vary in extremes of aesthetic values:
Choice # 1Plain and simple catch netting attached to hooks mounted along inside periphery of orchestra pit. Netting is of type used in aerial performances such as high wire walking and trapeze acts.
AdvantageEconomical
DisadvantageNegative aesthetic value.
Choice # 2Placement of large Styrofoam filled bags on orchestra pit bottom. These are type of bags utilized in catch pits for pole vaulters and high jumpers in field-track events.
AdvantageEconomical
DisadvantageZero aesthetic value.
Choice # 3Placement of sectional, portable, flooring onto portable support structure similar to scaffolding. Height of portable floor top in orchestra pit could be designed to be slightly less than top of "people barrier" in front of orchestra pit.
AdvantageLessened erosion of aesthetic value of auditorium stage area.
DisadvantageConsiderable time and labor expenses incurred during set-up and take-down of portable, elevated pit flooring and portable support structures.
Choice # 4Permanent installation of hydraulic operated orchestra pit floor which could be brought to desired floor height by energizing an automated system.
AdvantageTotal aesthetic enhancement of auditorium stage area, the increased achievement of theatrical effectualness, additional positive selling feature when attempting to attract national and international theatrical groups.
DisadvantageCost

Again, Frank, we are emphasizing the local, non-professional performer using the stage and ascending to/descending from stage that we must protect. For instance, had the local nine year-old boy, as described earlier, experienced permanent disability or even death from the fall into the pit. .... can you imagine the financial cost to the City!! You have a tough call to make. I, personally, would recommend Choice # 4 hydraulic operated floor. As you described to me, the room for control panel, pre-run conduit and anticipated electrical circuits in main distribution panel were all done back during the *842 initial design and construction of the auditorium. Some person or some group of people had vision back "when" and planned for the day when a raise-lower orchestra pit floor would be installed.

The City opted to build a portable wooden structure which could be placed over the orchestra pit and removed when the space was needed. The minutes of the Community Development Departmental Safety Meeting held October 3, 1989 reflected the following discussion under New Business:
An update was given by Blane Toce on the construction of a portable wooden deck to enclose the orchestra pit at the Heymann Performing Arts and Convention Center to prevent possible accidents during performances.
An Internal Memorandum dated September 10, 1991 from Frank Bradshaw to Phil Lank regarding the Five-Year Capital Outlay Program for the Heymann Performing Arts center includes a cost estimate for a hydraulic orchestra pit cover. The Memorandum provides:
ORCHESTRA LIFT
This proposition was in the original 1988-89 renovation project as an add-alternate; but, it was not accepted. The facility's user groups still [feel], the installation of an orchestra lift will make the HPACC multi-functional by:
* Providing an extension or cover over the orchestra pit. Virtually every act that has played this house since it reopened has requested a pit cover or extension in order to play the audience more intimately.

* Providing additional seating in the pit. Depending on the act and the arrangements, 75 more seats could be added; thus, making the building more attractive and marketable to promoters.

* Properly framing the orchestra when in the pit by elevating the floor when needed, coupled with a modification of the pit, necessitated by the lift installation, the orchestra could perform its function without the feeling of "playing in a hole".

Another feature this cover/lift could provide to the complex is to cover the orchestra pit when not needed. This would be a tremendous safety feature for the building as pointed out in a recent Risk Management inspection report. (Risk Management Safety Audit attached)
For more detail, I have attached the scope of work detail with cost estimations as prepared by Wayne Corne of Corne, Sellers and Associates.
ESTIMATED COST: $434, 815.00
Considering the cost of the hydraulic lift cover, the portable wooden orchestra pit cover appeared a reasonable option for the City. It is clear from the correspondence the City safety supervisor intended that the pit remain covered when not in use. However, the City decided to charge every lessee one hundred dollars to place the cover on the open orchestra pit. Additionally, the request for the pit cover had to be made in advance of the event to insure that auditorium staff would be available to install the structure.

ACTION OF THE TRIAL COURT
Mr. McDaniel sued the Lafayette City-Parish Consolidated Government under La.R.S. 9:2800, the Carencro Lions Club and John Gullett under La.Civil Code art. 2317. In accordance with La.R.S. 13:5105, which prohibits jury trials of suits against political subdivisions of the State, the liability issue relating to the City was tried before Judge Michot and the liability of the remaining defendants was tried by a jury.
*843 At the close of plaintiff's case, the trial court granted Motions for Involuntary Dismissal and Directed Verdict in favor of defendants, finding Mr. McDaniel was solely at fault in causing the accident. The trial court reasoned Mr. McDaniel was a professional performer and thereby familiar with the stage; he was delinquent in not performing a sound check prior to his performance, which would have familiarized him with the auditorium arrangement; and he should have been more careful about looking where he was walking. Ruling from the bench, the trial judge stated:
Mr. McDaniel's own testimony states that he was a performer for some 18 to 20 years, performing on stages.
And also the evidence in the case came out that Mr. McDaniel is the only case that came out in evidence in this case where a musician, a performer, did not participate in the sound check.
And he admitted that he didn't participate in the sound check as well.
Also, thathe testified that when he was walking out past his monitors that he was not looking at his feet but was looking ahead of him at the audience.
And he was also walking where he couldn't see obviously which isthose are three basic problems that he's got.
You try to walk where you can't see and that's common basic sense. And that the due care that individuals have to exercise when they're walking to protect themselves is to not walk where they don't see; don't put their feet where they can't see.
It's sort of thea similar premise of you don't dive into the pond without going and checking and making sure that it's deep enough.
You walk out where you can't see, then if something happens you only have yourself to blame basically on this.
And so the Court finds that as far as the City's liability is concerned it was Mr. McDaniel's fault, not the City's, that caused the accident.
Turning to other defendants the judge found even if the orchestra pit had been covered, Mr. McDaniel may have walked out over the pit cover and may have fallen four feet to the floor of the auditorium. He concluded:
So thatthe orchestra pit cover wouldn't have been an ensurer (sic) of safety under these circumstances when he was looking at the audience, not at his feet, and heading in that direction.
So looking at that even in light most favorable to the nonmover (sic) party, the Court will grant the motion as to the City, theI mean, as to the Lions Club and Gullett and their insurance companies.
Plaintiff will be cast with costs.

LAW AND DISCUSSION
An Involuntary Dismissal at the close of the plaintiff's case is provided for in Louisiana Code of Civil Procedure Article 1672 which states in relevant part:
B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
Like a Motion for a Directed Verdict, (La.Code Civ.P.art. 1810), granting of a motion for involuntary dismissal *844 ends the plaintiff's case and should be used only when plaintiff has failed to present a prima facie case of liability. The issue for the trial court is not whether plaintiff has proven his case by a preponderance of the evidence but rather whether prima facie evidence has been presented "sufficient to establish a given fact, which, if not rebutted or contradicted, will remain sufficient". Whitt v. Wal-Mart Stores, Inc., 96-906, p. 4 (La.App. 5 Cir. 3/12/97); 690 So.2d 1009, 1011. On a motion for directed verdict, this court has stated:
On appeal, we must not ascertain whether Moore, the Plaintiff, proved his case by a preponderance of the evidence, but, after viewing all of the evidence submitted, we must ascertain whether reasonable people could have reached a verdict in favor of Moore, the non mover.... Further, in determining the propriety of the trial court's decision, the evidence must be analyzed through the looking glass of substantive law.
Moore v. Brookshire Grocery Company, Inc., 01-737, p. 4 (La.App. 3 Cir. 1/16/02); 805 So.2d 446, 448.
We find, from a review of the record, Mr. McDaniel, at the very least, presented prima facie proof sufficient for reasonable people to resolve the liability question in his favor and in accordance with the substantive law found in La.R.S. 9:2800 and La.Code Civ.P. art. 2317.
Louisiana Civil Code Article 2317 provides in relevant part:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things, which we have in our custody. This, however, is to be understood with the following modifications.
Louisiana Revised Statutes 9:2800 provides in relevant part:
Limitation of liability for public bodies
A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge.

DUTY AND NOTICE
The judge failed to apply the appropriate analysis in evaluating the City's corporate duty vis a vis the alleged negligence of plaintiff. The trial court determined the ambit of the City's duty by limiting it to the scope of plaintiff's knowledge and reasoned, since plaintiff should have known the danger existed, he was negligent in failing to avoid it or take steps to guard against it. Thus, his negligence, the judge concluded, was the sole cause of his injury. The trial judge's analytical approach was specifically rejected in Politz v. Recreation and Park Commission for Parish of East Baton Rouge, 619 So.2d 1089 (La.App. 1 Cir.1993) writ denied, 627 So.2d 653 (La.1993). In that case, plaintiff, an experienced softball player was injured when she stepped into a hole under the second base. The trial court granted an involuntary dismissal. In the reasons for judgment, the trial court discussed the plaintiff's actual knowledge and actions and concluded the umpire warned the *845 plaintiff the base was loose and had, therefore, fulfilled his duty to the plaintiff. Further, the trial court found the plaintiff was an experienced softball player and was well aware physical sports were dangerous. The appellate court reversed, stating:
A court may not define the defendant's initial duty in terms of the plaintiff's actual knowledge, and thereby achieve the same result which would be reached if assumption of the risk were still a valid defense in Louisiana, operating as a total bar to plaintiff's recovery. A defendant's duty does not turn on a particular plaintiff's state of mind, but instead is determined by the standard of care which the defendant owes to all potential plaintiffs. The determination of the plaintiff's knowledge regarding the risk of injury is made after fault on the part of the defendant has been established and is governed by the comparative fault principles enunciated in LSA-C.C. art. 2322.
Id. at 1095.
The standard of care owed by the City to patrons and performers of the Heymann Performing Arts center is found in La.R.S. 9:2800. Under this statute, to carry his burden, plaintiff was required to show: (1) the orchestra pit was in the care, custody and control of the defendants; (2) the orchestra pit had a vice or defect which created an unreasonable risk of harm; (3) his injury was caused by the defect. Additionally, under the provisions of La.R.S. 9:2800 Mr. McDaniel must prove the City had actual or constructive notice of the dangerous condition. Dupree v. City of New Orleans, 99-3651 (La.8/31/00); 765 So.2d 1002.
There is no genuine dispute, the orchestra pit was in the care, custody and control of the City. The City first attempts to shift total blame to Mr. Gullett, who leased the auditorium on behalf of the Lions Club. The City contends Mr. Gullett as a professional promoter should have requested the pit cover. We note, however, the lease agreement does not inform a prospective lessee of the known dangers associated with an uncovered orchestra pit and the City presented no testimony to establish Mr. Gullett knew or should have known of the accidents involving the pit. The City opted to remain silent even though it had information involving a known hazard. The City did not share this information with the Mr. Gullett or with Mr. McDaniel. The City was clearly in a superior position to prevent the accident. See, Maldonado v. Louisiana Superdome Commission, 95-2490 (La.App. 4 Cir. 1/22/97); 687 So.2d 1087, writ denied, 97-469 (La.4/18/97); 692 So.2d 448.
In Maldonado, plaintiff suffered a herniated disk when he slipped and fell in a pool of spilled beer just outside the door of the Superdome. The accident occurred at 7:30 in evening and the weather was clear and dry. Thirty minutes after he had fallen, the area in front and around the door was being cleaned up by Superdome employees. The issues presented on appeal were whether the Superdome had constructive or actual knowledge of the spilled beer through the presence of ticket-takers at the turnstile near where plaintiff fell and whether the plaintiff's inattentiveness contributed to the accident. In this case, the court found the Superdome had constructive notice of the spillage that caused Mr. Maldonado to fall and an opportunity to correct the condition. In finding the Superdome solely at fault, the court stated:
The Superdome was in a superior position to discover the hazard and either place warnings or clean the area in order to avoid injuries to patrons. Furthermore, the failure of those responsible for detecting and cleaning up the *846 spill was found to be the direct cause of plaintiff's injuries.
Id. at 1093.
The testimony established during the concert the City had full control of the stage area including lighting and sound. The City had several employees, including a stage manager, lighting technician, follow spot technician and event coordinator, on staff that evening to insure the success of the event.
Mr. McDaniel testified that he did not see the unlit uncovered pit while he was on stage due in part to the extreme stage lighting at the time. He had never been to the Heymann Performing Arts Center before and was unaware of the history of accidents involving the orchestra pit. In contrast, documentation in the record and testimony established that the City was well aware of the risks involved and attempted to remedy the situation by building a portable wooden pit cover. The practice of keeping the pit uncovered substantially increased the risk that someone might fall. The City was in a superior position to discover the hazard and warn potential lessees of the danger or keep the pit covered at times when it was not in use.
The City contends the orchestra pit cover was built for Wayne Newton and not because of any risk of liability. This claim by the City appears disingenuous considering the history of recurring accidents, correspondence in the record detailing the City's concern and the testimony of its employee, Pat Roy, safety supervisor. Alternatively, the City contends even if the cover was built to prevent accidents, its only concern was for the non-professional performer because the professional performer "is always conscious of where the edge of the stage is and always aware of an existing orchestra pit." However, the record indicates prior to Mr. McDaniel's fall a local dance instructor (during a performance) misjudged the edge of the stage and fell into the pit. Additionally, an auditorium employee who was in the process of running cable inadvertently backed into the pit and was injured. Both individuals were aware of the existence of the orchestra pit, were familiar with the auditorium arrangement and had experience working around a stage. However, both were injured from a fall into the uncovered pit. We decline to adopt the professional/non-professional distinction urged by the City and find the evidence plaintiff presented was sufficient to establish the uncovered pit presented a risk even to individuals familiar with the stage and the existence of the orchestra pit at the Heymann Performing Arts Center.

UNREASONABLE RISK
While the uncovered orchestra pit presented a risk, the City was well aware existed, we recognize not every imperfection constitutes a defect within the meaning of the statute. To constitute a defect, the uncovered orchestra pit must pose an unreasonable risk of injury to persons exercising ordinary care. See, Guild v. City of New Orleans, 617 So.2d 967 (La.App. 4 Cir.1993).
In Guild, the issue presented was whether a 8.75 inch platform in the meeting room of the Algiers branch of the New Orleans Public Library presented an unreasonable risk of injury. The plaintiff, Ms. Guild had been sitting at a table on the platform for about an hour receiving income tax information from a tax consultant. When she stood up and turned to leave, she took one or two steps and fell. She claimed she had forgotten about the platform and she thought the floor was all one level. Ms. Guild alleged several factors made the platform unreasonably dangerous; the lighting was dim, the carpeting *847 on the floor and vinyl on the platform were similar in color, the room contained no signs or markers indicating the need to step down, no one alerted her to the danger. The trial court dismissed Ms. Guild's suit and the appellate court reversed. The only issue for the appellate court was whether the plaintiff proved by a preponderance of the evidence that the condition of the premises constituted a vice or defect which created an unreasonable risk of harm. The appellate court found that it did and stated:
Generally, Louisiana courts have determined that not every imperfection constitutes a defect. In order to be considered defective, "the imperfection must pose an unreasonable risk of injury to persons exercising ordinary care and prudence ..." The determination of whether a particular condition is a defect is not mechanical, but merely provides guidance to judges in evaluating the risks imposed by the condition.... The judge must "weigh certain considerations including the gravity of the risk and the harm, the individual and societal rights and obligations, and the social utility involved....
Using these standards, we find that the plaintiff in the instant case proved by a preponderance of the evidence that the conditions in the meeting room ... were defective because they posed an unreasonable risk of harm." "She was unable to differentiate between the height of the platform and level of the regular floor because of the poor lighting and the similarity of the color of the two types of flooring...."
Id. at 969.
Additionally, in Richardson v. City of Gramercy, 99-1162 (La.App. 5 Cir. 4/25/00); 772 So.2d 682, the Illinois Central Railroad was utilizing the Gramercy Council Chambers to process claims arising out of a train derailment. Plaintiff was requested to appear in the Council Chambers to present her claim to the railroad. The plaintiff was injured when she fell while attempting to descend the stairs from the platform. The trial court held the steps were unreasonably dangerous because they had no handrails, no sign or other warning, the platform, stairs and ground level were all the same color and material and experts for both city and plaintiff testified that a twenty-one inch height difference between the platform and ground level was inherently dangerous. The appellate court articulated the rule:
In determining whether a defect presents an unreasonable risk of harm, the trier of fact must balance the gravity of the harm against the individual and societal rights and obligations, the societal utility and the cost and feasibility of repair. In other words, the trier of fact must decide whether the social value and utility of the hazard outweigh, and thus justify, its potential harm to others.
Id. at 684.
In determining whether the uncovered orchestra pit presented an unreasonable risk of harm under the statute, the following factors are to be considered and weighed: (1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved. Dupree v. City of New Orleans, 99-3651 (La.8/31/00); 765 So.2d 1002.
From a review of the testimony, we find plaintiff presented prima facie evidence that the uncovered orchestra pit presented an unreasonable risk of injury to individuals using the auditorium. The City had a great interest in protecting patrons and performers from injury and had a great *848 interest in protecting itself from liability. In fact, the City built a pit cover for just such a purpose. The risk that others would suffer injury from an uncovered orchestra pit was known and virtually certain to occur. The record indicates every eighteen months an individual was injured from a fall into the pit and the City was well aware of this fact. The injuries associated with the falls were minor to severe. One individual was killed from a fall into the pit. The burden of adequate precautions was minimal. In fact, the City built the pit cover and the record reflects the City's safety supervisor's intent was to keep the pit covered "when orchestra pit is not being used." However, despite the supervisor's recommendation, his supervisors decided to keep the pit uncovered unless specifically requested in advance by a lessee. The City now argues the industry standard is to keep the pit uncovered and offered the testimony of Frank Bradshaw who stated, "Standard operating for the building is for the pit cover in the off position. That's pretty much standard nationwide." Mr. McDaniel was prohibited from presenting testimony of Fabian Patin, an expert in lighting and architecture to address this issue. Prohibiting Mr. McDaniel from presenting the testimony of Fabian Patin with regard to the industry standard was clear error, as discussed below. Mr. Patin would have testified the City was not in compliance with several standard building code regulations including the Life Safety Code, Section 5-2.2.6.1 which provides:
Means of egress ... that are more than 30 inches above the floor or grade below shall be provided with guards to prevent falls over the open side.
The Standard Building Code, Section 1121 which provides:
All unenclosed floor and roof openings, open and glazed sides of landings and ramps, balconies or porches which are more than 30 inches above grade or a floor below shall be protected by a guardrail.
The Occupational Safety and Health Act (OSHA), Section 1910.23(a)(5):
Every pit and trapdoor floor opening, infrequently used, shall be guarded by a floor opening cover of standard strength and construction. While the cover is not in place, the pit or trap opening shall be consistently attended by someone or shall be protected on all exposed sides by removable standard railings.
Additionally, to further justify its policy, the City argues the majority of auditorium lessees prefer the pit uncovered. The City's position is clearly contradicted by its own record which contains a memorandum dated September 10, 1991, which states: "Virtually every act that has played this house since it reopened has requested a pit cover or extension in order to play the audience more intimately;" The social utility in keeping the pit uncovered when not in use does not outweigh the potential hazard involved in having a large, unlit hazard immediately adjacent to the stage. When the pit is being used for an orchestra or for other purposes connected with a performance, the presence of individuals and lights in the pit, serve to warn a stage performer of its existence. In this case, the orchestra pit was not in use and there were no lights in the pit which would have alerted Mr. McDaniel that it existed.
The City relies on the Louisiana Supreme Court case of Boyle v. Board of Supervisors, Louisiana State Univ., 96-1158 (La.1/14/97); 685 So.2d 1080. In Boyle, plaintiff, Judith Boyle, a forty year old student, was injured when she tripped and fell on a sidewalk on the campus of LSU. The trial court found in favor of plaintiff, the appellate court affirmed and *849 the Louisiana Supreme Court reversed, stating:
Weighing against the risk and gravity of injury is the social utility, including cost of repair. The utility of sidewalks on university campuses is clear as pointed out by the court of appeal. It carries great weight in the equation. Furthermore, LSU has over 22 miles of sidewalk on its campus. (One witness estimated 25 miles.) To police this much ground and keep it in perfect repair is beyond reasonable expectation for LSU or any other university.
Id. at p. 1083.
Of significance to the Louisiana Supreme Court in Boyle was the fact that this was the first accident at the site, the injury to the plaintiff was minor, and the cost to the university to maintain sidewalks in near perfect condition was great. We find the facts of Boyle do not support the position of the City. In fact, Boyle mandates an opposite result in the present case. The accident history involving the pit, the minor cost to the City of keeping the pit covered when not in use, and the severity of the plaintiff's injuries mandates a finding the City was at fault in not covering the orchestra pit.
Even if an unreasonable risk exists, the City insists it fulfilled its duty to Mr. McDaniel by placing a strip of white tape on the edge of the stage. A similar argument was made in Dupree v. City of New Orleans and Sewerage and Water Board of New Orleans, 99-3651 (La.8/31/00); 765 So.2d 1002. In Dupree, the plaintiff was injured when he struck a street cave-in which was covered with water, concealing its true width and depth. The Sewerage and Water Board asserted it did not breach its duty because it placed one barricade at the location of the cave-in. The trial court disagreed and found the Sewerage and Water Board at fault and the plaintiff free of fault. The appellate and the Louisiana Supreme Court affirmed. The Court stated:
It is the duty of one with custody or garde of a thing presenting an unreasonable risk of harm to properly and adequately label, mark or barricade places in that site so as to provide adequate warning to persons using the area.
Id. at 1015.
We find the placing of a strip of white tape at the edge of the stage did not properly alert Mr. McDaniel of the existence of a seven foot drop off to a concrete floor and, thereby, exonerate the City from liability.
We are satisfied the record contains sufficient prima facie evidence to find the uncovered orchestra pit presented an unreasonably dangerous defect to individuals using or working around the stage of the Heymann Performing Arts Center.

CAUSATION
Nonetheless, the City contends the uncovered orchestra pit did not cause Mr. McDaniel's injury, rather it was his own inattentiveness which caused the accident and the fact that he did not participate in a sound check prior to performing on an unfamiliar stage. Testimony by employees in control of the stage and the performance, described the conditions which existed on stage and the events leading up to the accident. Michael Schnauder, stage manager testified he was on a headset with Marc Gambino, lighting technician and Carla Romero, follow spot technician. He stated there were no lights shining into the orchestra pit when Mr. McDaniel was performing. When the sound system malfunctioned he testified: "But I wasn't paying a lot of attention to Mr. McDaniel because of what we were doing ... Fifty minutes into it, the bass guitars failed to *850 continue to work, so me and the owners of the sound equipment were attempting to fix it. And during this time is when Mr. McDaniel was telling jokes and stalling for time, waiting for us to try to get this up and running when the incidentaccident occurred."
Carla Romero, follow spot technician, testified Mr. McDaniel had a 1200 watt spotlight on him while he was performing. She testified the spotlight did not have a blue gel filter which had been requested in the contract with the auditorium. The blue gel filter reduces the intensity of the spotlight. She testified when Mr. McDaniel began to converse with the audience, she did not follow him with the spot the entire time. She testified, "But when I noticed him walking forward, that's when I grabbed the spot, and Iyou know, I tried my best to warn, you know, `You're in danger.'"
Marc Gambino, lighting director, testified, in addition to the 1200 watt spotlight, on Mr. McDaniel, the stage was lit with three-color wash overhead lights. Cove lights located over the audience, pointed in the direction of the stage, further illuminated the faces of the performers. Mr. Gambino testified when Mr. McDaniel stated he could not see the audience, he raised the houselights fifty percent. He stated the houselights were located over the audience and did not illuminate the orchestra pit.
Mr. McDaniel testified he could see the wall of the pit and the audience just on the other side of the wall, he assumed the stage extended to the audience. The record supports a finding even if Mr. McDaniel had performed a sound check, momentary inadvertence, or disorientation from the extreme stage lighting could have caused him to forget the existence of the pit, its location, or the distance to the edge of the stage. The accident history indicates even performers and employees familiar with the auditorium stage have fallen into the pit.
Reviewing the substantive law and the prima facie evidence presented by plaintiff, we find a reasonable fact finder could conclude the City was either solely at fault or contributorily at fault in causing Mr. McDaniel's accident and injuries.

EXCLUSION OF EXPERT TESTIMONY
The trial court denied plaintiff's request to present testimony of Fabian Patin, an expert in lighting and architecture. Mr. Patin would have testified concerning building code standards applicable to the auditorium stage and orchestra pit and whether the City was in compliance with those standards. Additionally, Mr. Patin would have testified that the house lights failed to illuminate the orchestra pit and the glare from the follow spot caused the orchestra pit to appear even darker than normal. The trial court excluded the testimony on the basis that the exact lighting conditions on the evening of Mr. McDaniel's performance could not be duplicated, and therefore, he would not allow testimony of Mr. Patin as to the lighting conditions at the time of the accident. Louisiana Code of Evidence Article 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Mr. McDaniel presented testimony of City employees who were working the event the night of the accident and testimony of plaintiff himself. However, the testimony of an expert would have assisted the jury in understanding the circumstances *851 of the accident and the conditions on stage faced by Mr. McDaniel. We find it was error on the part of the trial court to exclude the testimony of Fabian Patin.

DECREE
Based on the foregoing, we reverse the judgement of the trial court and remand for a trial on the merits not inconsistent with this opinion. All costs of this appeal are assessed to the Defendants.
REVERSED AND REMANDED