JEANINE PRYOR

VERSUS

IBERIA PARISH SCHOOL BOARD

**********
APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 106,274-G
HONORABLE CHARLES L. PORTER, PRESIDING
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Sylvia R. Cooks, Billy Howard Ezell and J. David Painter, Judges.

Painter, J., dissents in part and assigns written reasons.

**REVERSED AND RENDERED.**

M. Terrance Hoychick
141 South Sixth Street
P.O. Drawer 391
Eunice, LA 70535-0391
(337) 457-9331
COUNSEL FOR PLAINTIFF-APPELLANT:
    Jeanine Pryor


Ronald J. Fiorenza
Andrew E. Schaffer
Provosty, Sadler, DeLaunay, Fiorenza & Sobel, APC
934 Third Street, Suite 800
P.O. Drawer 1791
Alexandria, LA 71309-1791
(318) 445-3631
COUNSEL FOR DEFENDANT-APPELLEE:
    Iberia Parish School Board

**COOKS, Judge.**

This appeal involves an action for damages brought by Jeanine Pryor, who was injured when she fell exiting bleachers at a football game. She appeals the trial court's judgment denying her claims.

### FACTS AND PROCEDURAL HISTORY

On October 29, 2004, Ms. Pryor traveled from Lake Charles to New Iberia to watch her grandson's team, Barbe High School, play a play-off football game against New Iberia High School. The game was being played at Lloyd G. Porter Stadium, a facility owned and maintained by the Iberia Parish School Board (hereafter School Board), and New Iberia High School's home stadium. It was Ms. Pryor's first time at Lloyd Porter Stadium.

Spectator seating is positioned on both the east and west sides of the football field. On the west side of the field, which is traditionally where the home teams fans sit, there is an apparently much "nicer" stadium facility made of concrete. The trial court, in his reasons for judgment, noted this facility sits well off the ground and has entrance and exit ramps leading to the seats. The trial court also wrote, in accordance with the Americans with Disabilities Act, persons with disabilities have reserved parking, access ramps, walkways and reserved seating.

On the east side of the field, which is where the visiting teams fans traditionally sit, there is a metal frame bleacher approximately fifteen (15) feet high and approximately two hundred fifty (250) feet long. Spectators are seated on nine (9) wood seat boards and nine (9) wood foot boards. The seat boards are uniform and symmetrical with the exception of the first seat board to the second seat board, which are positioned approximately eighteen (18) inches apart. All the other seat boards are approximately eight (8) inches apart in height. The difference was so great speculation was voiced at trial that there was a missing board between the first and

second seat board. The bleachers had rails around the rear and the upper portions of their sides of the bleachers. There were no aisles allowing a spectator to walk up into the stands nor were there any rails to help balance someone walking up the rows.

Upon arriving at the stadium, Ms. Pryor walked to the visitor's side of the stadium. She testified the ground was uneven, and she held on to her daughter's arm for balance. Ms. Pryor was sixty-nine years old, and was still recovering from hip replacement surgery she underwent approximately one year prior to the accident.

When she arrived at the bleachers on the east side, Ms. Pryor discovered that the players and cheerleaders standing on the sidelines of the field blocked the view from the bottom rows. To view the game, she was required to climb up into the stands. According to Ms. Pryor she could not step up the eighteen inches from the first seat board to the second, so she had to grab the second board and lay on her side so she could swing one leg up at a time. She was then able to stand up and, with her daughter's assistance, walk up the remainder of the rows.

At half-time, Ms. Pryor needed to use the restroom, and her daughter helped her start down the bleachers. When they came to the second seat board, she stepped down slowly trying to reach the first seat board, which was over twice the distance apart as the other seat boards. Ms. Pryor was unable to successfully step down, and fell back onto the seat board. She testified she released her daughter's hand, so as to not pull her down with her. As a result of the fall, Ms. Pryor suffered a severely broken leg and other injuries. She was transported from the stadium by ambulance and taken to Dauterive Medical Center in New Iberia.

While at Dauterive Medical Center, Ms. Pryor was informed she would need surgery to repair the broken leg. Ms. Pryor chose to return to Lake Charles and have her own orthopedic surgeon provide her care. After having surgery, Ms. Pryor stated

she has endured many difficulties and complications.

Ms. Pryor filed a lawsuit for damages suffered as a result of her fall against the School Board, alleging the bleachers were defective. After a trial on the merits, the trial court took the matter under advisement. Eventually, judgment was rendered in favor of the School Board. The trial court found the School Board was the custodian of the stadium and, in particular, the bleachers in question. Although the trial court found the bleachers were in fact defective, it concluded the bleachers did not present an "unreasonably dangerous" risk of injury to Ms. Pryor. Specifically, the trial court wrote:

> . . . In premises liability actions, the absence of an unreasonably dangerous condition of the thing implies the absence of a duty on the part of the defendant.
> In applying this balancing test, it appears that the probability and gravity of the injuries Ms. Pryor sustained as a result of the "alleged" missing rung between the first and second bleacher does not greatly outweigh the social utility of the defective bleachers. Especially, when considering the provisions made by the Iberia Parish School Board to reserve a safe and accessible location for persons with disabilities on the west side of the football field.

The trial court also concluded Ms. Pryor observed the gap between the first and second seat board, yet chose to straddle the second seat board and "ascend to the top at her own risk." Although noting there were no other means of ascending these bleachers, the trial court nonetheless found "Ms. Pryor could have chosen to sit on the bleachers in the concrete stadium on the west side rather than the bleachers or grandstand that were more difficult to ascend. Ms. Pryor failed to use reasonable care in choosing to scale the bleachers or grandstands."

Formal judgment was signed dismissing Ms. Pryor's suit against the School Board. Ms. Pryor timely perfected this appeal, and asserts the following assignments of error:

1.  The trial court committed legal error in failing to conduct a proper

analysis of the risk-utility balancing test.

2.    The trial court committed manifest error in concluding the defective bleachers were not unreasonably dangerous.

3.    The trial court committed manifest error in relying on facts not in evidence to find there was adequate and safe seating available on the home-team side.

4.    The trial court committed manifest error in ascribing fault to the plaintiff for choosing to sit in the defective visitor's bleachers rather than seeking seating in the home stands which allegedly were safely designed.

## ANALYSIS

### I.   *Liability.*

Louisiana Civil Code article 2317.1 provides the obligations of an owner of land and buildings. It provides:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

This principle extends to public entities, such as the School Board, under La.R.S. 9:2800, which provides in pertinent part:

> [N]o person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.

Under this statute, to carry her burden, Ms. Pryor must show: (1) the stadium and bleachers were in the care, custody and control of the School Board; (2) there was a vice or defect which created an unreasonable risk of harm; (3) Ms. Pryor's injury was caused by the defect; and (4) the School Board had actual or constructive knowledge of the dangerous condition. *McDaniel v. Carencro Lions Club*, 02-1244 (La.App. 3

Cir. 3/12/03), 846 So.2d 837, *writs denied*, 03-1061, 03-1065, 03-1069 (La. 6/27/03), 847 So.2d 1269 (citing *Dupree v. City of New Orleans*, 99-3651 (La.8/31/00), 765 So.2d 1002).

It was stipulated that the bleachers where the accident occurred was in the care, custody and control of the defendant. The trial court found the bleachers were defective, which the School Board does not deny, and also that the defect was a cause-in-fact of Ms. Pryor's injuries. The trial court also specifically found the School Board "knew or should have known of the differential between the bleachers through its maintenance and repair work." Thus, the trial court found the School Board had actual or constructive notice of the defect. Despite these findings the trial court held the defect in the bleachers did not make them unreasonably dangerous because the School Board allegedly provided safe seating for handicapped persons on the home team side of the stadium and there was a lack of past accident history involving the bleachers. Ms. Pryor contends the trial court erred in its finding that the defect in the bleachers did not create an unreasonable risk of harm. We agree.

"In determining whether a defect presents an unreasonable risk of harm, the trier of fact must balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair." *Reed v. Wal-Mart Stores, Inc.*, 97-1174, p. 5 (La. 3/4/98), 708 So.2d 362, 365. Simply put, the trier of fact must decide whether the social value and utility of the hazard outweigh, and thus justify, its potential harm to others. *Id*. This so-called risk-utility analysis has been more recently described by the supreme court as follows:

> There is no fixed rule for determining whether the thing presents an unreasonable risk of harm. To assist the trier-of-facts, we note that many factors are to be considered and weighed, including: (1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations;

and (6) the social utility involved.

*Dupree v. City of New Orleans*, 99-3651 (La. 9/1/00), 765 So.2d 1002, 1012.

The trial court stressed the social utility of the bleachers. Clearly, there is a utility to bleachers at a football stadium. However, as Ms. Pryor notes, the trial court did not discuss the risk of harm presented by the eighteen inch vertical difference between the first and second seat board. It simply weighed the admitted risk against the utility of having the bleachers and having a safe section reserved for the handicapped on the other side of the stadium. The fact that there may have been safe seating on the home-team side of the stadium does not outweigh the great risk of harm caused by the obvious defect in the bleachers where visitors were directed to find seating on the day of the present sporting event. We note that Ms. Pryor and her daughter testified there were no signs where they entered the stadium informing them that there was an area for handicapped seating.

We agree with Ms. Pryor that there is no utility or social value in exposing visiting patrons to an eighteen inch vertical differential between the seat boards in question. The record clearly established the eighteen inch differential violated general engineering and safety principles. Ms. Pryor's expert, Russ Rasnic, testified the bleachers violated of the National Fire Prevention Act 102, sections 3-6, which mandates a maximum differential of only ten inches, and the Building Exits Code, section 104, which allows for a maximum of 3/16 of an inch from step to step. The School Board's expert, Robert Barras, acknowledged that "no one has ever disagreed that [this is] a dangerous situation. I agree with you that this is a problem." Despite this conclusion, Mr. Barras disagreed with Mr. Rasnic's conclusion that the bleachers created an unreasonable risk of harm because he did not consider the seat boards to be steps. We find this conclusion overlooks the visual reality visitors confronted

when examining the bleachers. It was undisputed there were no steps present in these bleachers. Ms. Pryor did not simply avoid using steps, there were no steps. On cross-examination, Mr. Barras, admitted he was playing a game of semantics in his testimony:

> Q. Now what really does matter, Mr. Barras, is whether or not there was a defect or an unreasonable dangerous condition present at the Iberia, at the Lloyd Porter's visitor's bleachers. You've given us your opinion as to whether there was a code or not. Is it your opinion that if you have a set of stairs or steps upon which someone must descend and they are not uniform and you have an eighteen inch differential, vertical differential, then that would be an unsafe condition?
>
> A. In terms of my definition of steps, yes.
>
> Q. And the reason that you're not saying that this, these bleachers are unsafe is because your definition of steps does not include the bleachers at Lloyd Porter visitor's side stadium?
>
> A. That's correct.
>
> Q. All right. And that's really the only – we're – it's a matter of semantics at this point what exists if they are steps are unsafe. If they're not steps, then they're not. Is that fair?
>
> A. That's fair.

Mr. Barras acknowledged that the seat boards had to be walked upon to gain access to the bleachers because there were no aisles or steps provided. The utility of the bleachers and the defect they pose when weighed against the small cost, approximately $1,000.00 to remove the danger does not favor the School Board's decision to expose stadium visitors to the risk confronted by Ms. Pryor.[1]

Further, the lack of accident history does not sway us from our conclusion that the defective bleachers presented an unreasonable risk of harm. In *Rispone v. Louisiana State University and Agricultural and Mechanical College*, 93-1057

---

[1] The only evidence presented as to the cost to eliminate the dangerous condition was the testimony of Mr. Rasnic, who stated it would have cost no more that $1,000.00 to fix the problem.

(La.App. 1 Cir. 5/20/94), 637 So.2d 731, the court held non-uniform steps at a baseball stadium created an unreasonable risk of harm to a plaintiff despite no reported prior accidents. In *Head v. St. Paul Fire & Marine Ins. Co.*, 408 So.2d 1174 (La.App. 3 Cir.), *writ denied*, 412 So.2d 99 (La. 1982), this court held a hospital entranceway, which violated accepted safety standards, was found to present an unreasonable risk of harm despite no accidents over an eighteen-year period of time.

Likewise, the School Board argued the defective condition was open and obvious to the plaintiff, who, physically impaired as she was, should not have attempted to climb the visitor's bleachers. They argue this should preclude any award of damages to Ms. Pryor. Whether the danger presented by the defective thing is open and obvious is but one factor in determining whether that thing is unreasonably dangerous. Frank L. Maraist & Thomas C. Galligan, *Louisiana Tort Law* § 14-3 (1996). Further, even if a condition was obvious to the plaintiff, it may require that some measure of fault be placed on the plaintiff, but it does not strictly preclude liability on the owner of the thing that was defective. The jurisprudence is replete with cases where the danger was found to be "open and obvious" to the plaintiff, but the defect was still found to present an unreasonable risk of harm: *Cormier v. Colston*, 05-507 (La.App. 3 Cir. 12/30/05), 918 So.2d 541, where the plaintiff was injured while using a defective step, the danger of which she was aware of, having requested the defect be fixed previously; *Priest v. City of Bastrop*, 34,841 (La.App. 2 Cir. 7/11/01), 792 So.2d 80, where the plaintiff fell on a dangerous curb of which she was aware and had previously reported to the city); *Joseph v. City of New Orleans*, 02-1996 (La.App. 4 Cir. 3/5/03), 842 So.2d 420, where an elderly woman tripped over a three inch rise in a broken sidewalk which was found to be open and obvious; *Gray v. Louisiana Downs*, 585 So.2d 1238 (La.App. 2 Cir. 1991), where a

woman slipped on a hot dog on her way down steps after having seen it on the way up.

We also do not place any merit in the School Board's contention that Ms. Pryor was at fault for not sitting in the handicapped section allegedly available on the other side of the stadium. There is nothing in the record to establish that Ms. Pryor was *aware* that there was available seating on the other side of the stadium. In fact, both Ms. Pryor and her daughter testified they saw no sign where they entered the stadium to alert them to any specific seating for disabled persons. Further, Ms. Pryor points out there is no proof in the record that an ADA compliant section in fact existed on the home side of the stadium, nor was there any proof in the record that there was available seating in that section for that particular game. The trial court's observations in its reasons for judgment are not supported by the actual evidence presented during trial.

Given the clearly dangerous condition presented by the eighteen inch differential between the first and second seat boards, and the relatively inexpensive costs to remedy the dangerous condition, we find the trial court erred in finding the defect did not present an unreasonable risk of harm. We, therefore, reverse the trial court's ruling and render judgment finding the School Board liable for the injuries suffered by Ms. Pryor.

## II. *Contributory Negligence.*

In its answer to Ms. Pryor's petition, the School Board asserted as an affirmative defense the contributory negligence of Ms. Pryor in causing the accident. In a situation, as here, where an alleged tortfeasor is found to be blameless by a factfinder, the appellate court is free to assess what the record suggests are appropriate degrees of fault. *LeBlanc v. Stevenson*, 99-885 (La.App. 3 Cir. 12/22/99),

756 So.2d 356, *rev'd on other grounds*, 00-157 (La.10/17/00), 770 So.2d 766.

In *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985), the supreme court explained that, to determine the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages:

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.

In the instant case, we find the evidence supports a finding of fault on the part of both parties. Although we are convinced the majority of the fault should be assessed to the School Board, had Ms. Pryor, who was aware of the drastic height differential between the first and second seat board, exhibited the same degree of care descending the bleachers as she did ascending them, the accident would have been less likely to occur. This analysis is supported by the fact that Ms. Pryor was able to successfully ascend the bleachers prior to the game. She also could have opted to forego viewing the game at all in light of the damage posed. Accordingly, we find that the proper apportionment of fault is 30% to Ms. Pryor and 70% to the School Board.

## II. Damages.

Because the trial court erred in dismissing Ms. Pryor's claim, this Court is empowered by La.Code Civ.P. art. 2164 to render any judgment which is just, legal and proper. *Minkler v. Chumley*, 32,558 (La.App. 2 Cir.12/8/99), 747 So.2d 720. In making the initial award of damages, we are not limited to either the highest or the lowest amount of a reasonable range of awards which would have been affirmed on appeal; it is our charge to award an amount which is fair and just for damages

supported by the record. *Id*. Finding Ms. Pryor successfully proved her entitlement to damages, we will examine the nature and severity of the injuries suffered and then examine similar cases to determine an appropriate award. to. We note, however, this amount is subject to the reduction for comparative negligence set forth above. La.Civ.Code art. 2323.

Counsel for Ms. Pryor candidly acknowledges she had "extensive pre-existing medical problems." She has degenerative disc disease, osteoporosis and osteoarthritis. In April of 2003, she had lumbar surgery and in October of 2003, she had her left hip replaced. Despite her medical problems, at the time of the accident, Ms. Pryor had returned to her job performing federal drug testing on offshore platforms and large ships.

Following the accident on November 5, 2004, Dr. Lynn Foret performed surgery on her left leg which was broken in the fall. Ms. Pryor's recovery was compounded by a post-operative infection, which required an extended stay in the hospital. By January 18, 2005, Ms. Pryor saw Dr. Foret complaining of severe pain in her hip and lower back. Dr. Foret made the following comments:

> Severe lower back pain because of the way she is walking. Throwing her back out [with] a lot of sciatica [and] a lot of (L) leg buttock pain. Can't get moving [with] the knee area. (L) knee is collapsing on her [and] she has significant osteoarthritis but she keeps pushing it and keeps trying to go. She is climbing stairs [and] still working. Will have to have a total knee replacement on (L) because of severity of pain will increase to where she will not be able to work, not be able to climb [and] will not be able to go.

Dr. Foret referred Ms. Pryor to Dr. Jeffrey Kozak for a surgical consultation relative to her back problems. No surgery was performed although Ms. Pryor testified, at the time of trial, she was suffering greatly from lower back pain.

Ms. Pryor used crutches and/or a walker to assist her in moving after the surgery. In August of 2005, Dr. Foret prescribed a "quad cane" which she used until

November of 2007. Due to the use of the crutches, walker and cane, Mr. Pryor began to experience pain in her shoulders. Dr. Foret ordered an MRI on her left shoulder and gave her an injection for the pain. The MRI revealed a significant amount of arthritis in her left shoulder. Dr. Foret opined that she likely injured the shoulder in the fall or by the repeated trauma to the shoulder from having to use the walking aids. Dr. Foret recommended a total left shoulder replacement. Ms. Pryor stated she has not had the surgery, in large part, because she has no one to take care of her for the anticipated two-month recuperative period.

Dr. Foret believes Ms. Pryor will need total knee replacements bilaterally. Each surgery is estimated to cost $60,000.00. The shoulder replacement which Dr. Foret recommended will cost approximately $30,000.00. Ms. Pryor's past medicals were stipulated to be $80,745.79.

Dr. Foret testified Ms. Pryor's injuries greatly affected her lifestyle. Dr. Foret noted Ms. Pryor was extremely active and attempted to continue working until she finally had to quit. Dr. Foret believed the fall aggravated Ms. Pryor's prior back condition, which led to a recurrence of lumbar and back pain. He also stated the fall may have caused her hip to move, creating a potentially severe problem, though he could not say with any degree of medical certainty that this was more likely than not.

Ms. Pryor testified as to the significant effects the injuries suffered in the fall have had on her life. She has endured severe pain in her legs, shoulder and lower back. She was forced to finally stop working, which she testified led to significant emotional distress and anxiety. She testified her active lifestyle has been significantly curtailed, such that she was forced to sell her summer home because she could no longer enjoy it due to her difficulties and maintain it due to the financial strain the accident created. She also stated she was forced to put a "reverse mortgage" on her

home due to her loss of income.

In *Farmer v. Patrician SLP, L.L.C.*, 43,601 (La.App. 2 Cir. 10/1/08), 997 So.2d 578, *writ denied*, 08-2613 (La. 1/9/09), 998 So.2d 725, the plaintiff, who was 52 years old at the time, was visiting at his son's apartment, when a defective railing on the second floor balcony gave way, causing him to fall over fifteen feet. Plaintiff suffered multiple fractures to both wrists, and would almost surely require future surgeries on his wrists. Because he was unable to take care of himself, the plaintiff moved in with his elderly parents. The medical testimony indicate the plaintiff became depressed over his condition and inability to care for himself. The district court awarded plaintiff $39,000.00 for past medical expenses; $50,000.00 for future medical expenses; $75,000.00 for pain, suffering and mental anguish, past and future; $12,500.00 for loss of quality and enjoyment of life, past and future; and $153,000.00 for loss of income and/or earning capacity. The total award was $329,500.00. Plaintiff filed a motion for JNOV seeking an increase in damages. The trial court denied the motion and Plaintiff appealed. The appellate court found the award of $75,000.00 in general damages abusively low, and awarded plaintiff $200,000.00 in general damages. The appellate court also raised the award of loss of enjoyment of life from $12,500.00 to $100,000.00, noting plaintiff was a "generally active person" who enjoyed outdoor activities with his children, which he no longer could participate in after the accident.

In *Gray Ins. Co. v. Hunter*, 99-0497 (La.App. 4 Cir. 9/22/99), 752 So.2d 200, the court therein awarded $400,000.00 in general damages to a 65 year old plaintiff who had a anterior lumbar caged fusion at the L4-5 and L5-S1 levels. In affirming the award, the appellate court specifically noted:

> Due to the accident and subsequent surgery, she now experiences significant impairment of movement. Consequently, her quality of life

has also deteriorated. She is no longer able to work or travel great distances, nor will she be able to enjoy her golden years to the same degree she would have but for the accident.

*Id*. at 202.

We also note the *Hunter* case was decided approximately ten years ago and the record did not reflect the plaintiff in that case had extensive prior medical problems.

In *Crisler v. Paige One, Inc.*, 42,563 (La.App. 2 Cir. 1/9/98), 974 So.2d 125, the plaintiff was involved in an automobile accident, and underwent surgery on both knees and would likely require future knee replacement surgery. Plaintiff in this case had a pre-existing arthritis condition which was exacerbated by the accident. The appellate court affirmed a general damage award of $200,000.00 in this case based on the "extent of the injuries and the fact that [plaintiff's] condition will continue to worsen over time."

In *Pena v. Delchamps, Inc.*, 06-364 (La.App. 1 Cir. 3/28/07), 960 So.2d 988, *writ denied*, 07-875 (La. 6/22/07), 959 So.2d 498, the appellate court found a general damage award of $200,000.00 to a patron who slipped and fell in a grocery store was abusively low, when the patron required two extensive knee replacement procedures on her right knee, in addition to further hospitalization required by a subsequent infection. In this case, the defendant complained the plaintiff had a pre-existing arthritic condition which was aggravated by her fall. The appellate court raised the general damage award to $250,000.00.

Based on the injuries sustained by Ms. Pryor, which will likely require three additional surgeries, and the subsequent negative effect these injuries have had and will have on her life, we believe an appropriate general damage award is $300,000.00. We also award the stipulated amount of $80,745.79 in past medical expenses and $150,000.00 for future medical expenses ($60,000.00 for *each* knee replacement

surgery and $30,000.00 for the shoulder replacement surgery).

## DECREE

For the foregoing reasons, the judgment of the trial court dismissing plaintiff's suit is reversed, and judgment is rendered finding Defendant, the Iberia Parish School Board, seventy (70%) at fault in causing the accident and Plaintiff, Jeanine Pryor, thirty (30%) percent at fault. Damages are awarded in the sum of $530,745.79, which is the total of general damages of $300,000.00 and special damages of $230, 745.79. These awards are reduced to reflect Ms. Pryor's apportionment of fault. Defendant is cast with all trial and appeal costs in this matter.

**REVERSED AND RENDERED.**

**10-23**

**STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT**

**JEANINE PRYOR**

**VERSUS**

**IBERIA PARISH SCHOOL BOARD**

Painter, J., dissenting in part.

While I agree with the majority in all other regards, I disagree with the apportionment of fault. The evidence at trial support the conclusion that, while a dangerous condition existed in the bleachers, Mrs. Pryor's own negligence was a major contributing factor in her injury. Mrs. Pryor climbed the bleachers with great difficulty and had to resort to lying or sitting on the steps. When she decided to descend, she refused the help of her able bodied son and was accompanied by her daughter, who, as Mrs. Pryor was aware, was recovering from surgery. Although she had been unable to ascend on her feet, she descended on her feet to avoid embarrassment. She had several opportunities to avoid or limit her damage and rejected the more cautious course of action. Therefore, I would apportion fault 50% to Mrs. Pryor and 50% to the school board.