# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-355


**MARY FAYE O'QUIN, ET AL.**

**VERSUS**

**CONTINENTAL CASUALTY INSURANCE CO., ET AL.**


\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT,
PARISH OF AVOYELLES, NO. 2003-5496,
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

## MICHAEL G. SULLIVAN
## JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.


**AFFIRMED.**

**Frank E. Lamothe, III**
**Attorney at Law**
**315 Lee Lane, Suite 104**
**Covington, Louisiana 70433**
**Counsel for Plaintiffs/Appellees:**
　　**Mary Faye O'Quin**
　　**Logan O'Quin**
　　**Paige O'Quin**

**Darrel D. Ryland**
**Attorney at Law**
**Post Office Box 1469**
**Marksville, Louisiana 71351**
**(318) 253-5961**
**Counsel for Plaintiffs/Appellees:**
　　**Mary Faye O'Quin**
　　**Logan O'Quin**
　　**Paige O'Quin**

**John S. Hunter**
**Attorney at Law**
**400 Poydras Street, Suite 1540**
**New Orleans, Louisiana  70130**
**Counsel for Defendants/Appellees:**
      **Continental Casualty Insurance Company**
      **Sherie Johnson**

**J. Albert Ellis**
**Assistant Attorney General**
**Louisiana Department of Justice**
**Post Office Box 1710**
**Alexandria, Louisiana  71309**
**(318) 487-5944**
**Counsel for Defendants/Appellants:**
      **Louisiana State Police**
      **State of Louisiana, Department of Public Safety & Corrections**

**Maria A. Losavio**
**Losavio Law Firm**
**Post Office Box 12420**
**Alexandria, Louisiana  71315**
**(318) 767-9033**
**Counsel for Defendant/Appellee:**
      **Oil Mop, LLC**

SULLIVAN, Judge.

The State of Louisiana, through the Department of Public Safety and Corrections, Louisiana State Police (the State), appeals a judgment rendered in accordance with a jury verdict finding it 80% at fault in the death of Faron O'Quin and awarding Plaintiffs damages. For the following reasons, we affirm.

## INTRODUCTION

This matter arises from the death of a volunteer fireman at the site of a hazardous material spill when he was struck nearly fifteen hours after the spill by a pickup truck driven by Herman T. Kelly. Mr. O'Quin's widow, Mary Faye O'Quin, individually and on behalf of her minor children, Paige O'Quin and Logan O'Quin, filed a wrongful death and survival action against the State, alleging that it was liable for their damages because it failed to properly secure the scene of the initial accident.[1]

This matter proceeded to jury trial on September 25-29, 2006. The jury returned a unanimous verdict in favor of Plaintiffs and against the State, finding the State 80% at fault and Mr. Kelly 20% at fault for the death of Mr. O'Quin and awarding Plaintiffs damages. On November 27, 2006, the trial court rendered judgment in accordance with the jury verdict. After subtracting the amount of the damages awarded attributable to the fault of Mr. Kelly, Plaintiffs were awarded damages in the following amounts:

|  |  |  |
|---|---|---|
| Mary O'Quin | . . . . . . . . . . | $834,051.76 |
| Paige O'Quin | . . . . . . . . . . | $379,200.00 |
| Logan O'Quin | . . . . . . . . . . | $379,200.00 |

---

[1]Several other entities were named as defendants but, for various reasons, only the State remained a named defendant at the time of trial. Mr. Kelly and his insurer were not named as defendants, having settled for policy limits before suit was filed. Nevertheless, the jury verdict form contained interrogatories inquiring whether Mr. Kelly's conduct was a cause of the accident that resulted in the death of Mr. O'Quin and what percentage of fault should be attributed to Mr. Kelly. La.Code Civ.P. art. 1812 and La.Civ.Code art. 2323.

It is from that verdict and judgment that the State now appeals. In its sole assignment of error, the State asserts that:

> The [jury] erred by assessing eighty percent fault to [the] State DPS&C where the cause-in-fact of the accident was wholly the fault of unnamed codefendant's [sic] Herman Kelly's act of failing to properly operate his vehicle under extremely limited visibility and was thereby unable to avoid striking emergency personnel in the his [sic] path, is supported by the facts and the law.

**FACTS**

On March 14, 2003, at approximately 4:30 p.m., an eighteen-wheeler carrying potentially hazardous chemicals overturned, spilling some of its contents onto the entrance of Sammy's Truck Stop (Sammy's) on Highway 115 near its intersection with I-49 just outside of Bunkie, Louisiana. Several members of the Bunkie Fire Department arrived on the scene shortly thereafter. Fire Chief Joseph Frank summoned the Hazardous Materials Unit (HazMat) of the State Police due to his concern that the contents of the truck may have been leaking.

Jared Foreman and Mr. O'Quin, volunteer firemen with the Lone Pine Fire Department, separately stopped at the scene on the way home from their respective employments. Fire Chief Frank asked if they could stay and help his firemen, and they agreed. Mr. Foreman testified that firemen usually arrive at the scene of an accident before the police; therefore, firemen often worry about getting hit by motorists. After the police arrive, however, they trust them to secure the scene.

Trooper Shelly Hopkins was the HazMat officer who initially responded to the accident. As the HazMat officer in charge of the scene, his job was to designate the area that was off-limits to persons not wearing the appropriate protective gear. He testified that traffic control was not a part of his duties, but rather, that the road troopers were in charge of that aspect of the accident site.

2

Trooper John Douglas of the Louisiana State Police, an officer with nearly twenty-three years of experience as a road trooper at the time of the accident, arrived on the scene at 8:30 p.m. on March 14, 2003. His job was to engage in traffic control. He testified that the weather was clear when he arrived but that fog came in later in the evening and remained throughout the next morning in variations of thickness. He initially parked his vehicle near Officer Hopkins' HazMat vehicle so that his lights would be visible from the rear. Trooper Douglas testified that the fog was more dense closer to the interstate and that he ran the risk of being hit if he parked closer to the interstate. He acknowledged having stated in previous out-of-court testimony that if his vehicle would have been parked closer to I-49, it would have been the first thing that Mr. Kelly would have struck, and Plaintiffs' attorney would be representing his widow rather than Mrs. O'Quin.

Trooper Douglas stated that he was sitting in his patrol car in the center of the roadway with his blue emergency lights flashing when Mr. O'Quin was hit. Although he did not see the impact because he was facing the opposite direction, he stated that he heard tires squealing and then heard the impact. The impact occurred to the right and behind him. He stated that several fire trucks were "up there [near the chemical spill]" at the time Mr. O'Quin was struck. Trooper Douglas testified that his supervisor, Officer Martel, arrived at the scene after the O'Quin accident and ordered him to move his vehicle closer to the interstate in order to extend the perimeters of the accident scene. Because he was still concerned for his own safety, Trooper Douglas parked on the neutral ground of the exit ramp where I-49 meets Highway 115 to avoid being hit by oncoming traffic.

The trial testimony indicated that the pickup truck of an employee of Oil Mop, L.L.C., an emergency response company, became the staging area for many of the first responders, such as Mr. O'Quin, who were not actively engaged in offloading the overturned truck, and, thus had to remain outside of the chemical hazard zone established by the HazMat unit. Trooper Douglas testified that he was aware that various first responders came and went around the Oil Mop truck throughout the entire evening.

On March 14, 2003, at approximately 8:00 a.m., Virgil Blanchard, an employee of Oil Mop, responded to the hazardous material spill. His job was to transfer the load from the overturned truck to another empty eighteen-wheeler supplied by the trucking company so that the overturned truck could be up-righted. Mr. Blanchard testified that he parked his Oil Mop company truck off the right side of the road a short distance past the first entrance to Sammy's, ahead of the state trooper's vehicle.[2] He felt that he had parked in a secured zone. When he initially arrived, the state trooper's vehicle was blocking the first entrance to Sammy's, but the trooper later moved his vehicle to allow entry into Sammy's parking lot. Mr. Blanchard stated that after he finished transferring the chemical, he noticed that the trooper had moved his vehicle again. By the time the O'Quin accident occurred, Mr. Blanchard's Oil Mop truck was the first vehicle that a motorist headed east on Highway 115 would encounter upon approaching the initial accident site.

Mr. Blanchard testified that it was daybreak when he finished off-loading the chemicals and returned to his truck to store his gear. There was a group of people

_____

[2]According to a diagram prepared by Plaintiffs' expert, John Painter, after consulting the police report and taking his own measurements at the scene, the Oil Mop truck was parked nearly 300 feet away from the actual spill location.

4

standing near the tailgate of his truck, including Mr. O'Quin, Mr. Cory Butaud[3], and two wrecker company employees. He remembered that Mr. O'Quin had his reflective gear on at the time. The fog was very heavy and visibility was minimal. He testified that he heard the sounds of an engine racing and tires squealing, coming from the direction of the interstate. He then saw the lights of a vehicle about 150 to 200 feet away. Mr. Blanchard testified that they all put their hands in the air and began waiving, trying to get the attention of the driver. The driver started skidding toward them with his brakes locked. Mr. Blanchard was afraid of getting pinned behind his truck. He, another first responder, and Mr. O'Quin moved to the right side of the Oil Mop truck. Mr. O'Quin continued moving farther to the right and onto the driveway going into Sammy's. Mr. O'Quin was then hit by the truck and dragged for a couple of hundred yards.

Matthew Leary, a fireman with the Bunkie Fire Department, testified that Mr. O'Quin was already on the scene when he arrived in his fire truck, and they worked together throughout the evening. He left the fire truck's emergency lights on all night per standard procedure. Mr. Leary testified that between one and two in the morning, because of the extremely foggy conditions, he and Mr. O'Quin were nearly hit by a chartered bus headed to a casino. The bus stopped just two or three feet from the first responders' vehicles.

Mr. Leary stated that he saw Mr. O'Quin standing next to Mr. Blanchard's Oil Mop truck drinking coffee as he walked away to make a phone call. He then heard a truck with loud exhaust pipes but could not see the truck because of the fog.

---

[3]Mr. Butaud was an employee of B&V, an emergency response company that Oil Mop subcontracted with to render assistance in transferring the load after the chemical spill on March 14, 2003.

5

Mr. Leary first thought that it was on I-49 then realized that it was coming toward Sammy's. He heard someone yell that Mr. O'Quin had gotten hit, and he turned to see him going down in the ditch.

Robert Cornelius testified that he and his family stopped at Sammy's for a bathroom break on the morning of Mr. O'Quin's accident. Although Mr. Cornelius was very familiar with the location of Sammy's and he was on the lookout for it, he nearly drove past Sammy's because of the fog. He testified that he almost hit Mr. O'Quin as he turned into Sammy's because there was no warning of the blocked roadway. After parking, he went to check out the scene because he would be using the same road the next morning. He spoke with Mr. O'Quin and learned about the overturned truck. He noticed that the state trooper's car was parked "up inside" some other vehicles. He felt uneasy standing there talking because, although he could hear the sound of vehicles traveling on the roadway, he could not see anything. He told Mr. O'Quin to be careful and had walked only about twenty steps away when he heard brakes squealing and a thud. He turned around to see Mr. O'Quin face down in the ditch. HazMat officers immediately began CPR on Mr. O'Quin without success.

Charles Clark, a trucker who stopped at Sammy's almost daily to eat and refuel, was headed to Sammy's around 7:00 on the morning of March 15, 2003, traveling between fifteen and twenty miles per hour. He, too, testified that it was very foggy, that he could not see that the road was blocked until he got right up to Sammy's driveway, and that there were no prior warnings of the blocked roadway. After parking his truck, he found out that Mr. O'Quin had been hit. He remembered remarking to two men at the scene, within earshot of several officers, that "they [the

6

police] should have been at the exit[s] from the Alexandria side and Opelousas side warning people, you know, because it was so foggy."

Herman Kelly, the motorist who struck Mr. O'Quin, was thirty-six years old at the time of trial. He testified that he had been in the trucking business for eleven years. He lived on Highway 115 on the other side of the interstate from Sammy's. He was headed to work in his Ford F-150 pick-up truck at 6:45 on the morning of March 15, 2003. The weather was muggy and foggy. He was comfortable driving in the fog and was traveling about fifty miles per hour or less, a speed that he felt was safe. After crossing under the interstate, he saw a crowd of people directly ahead of him, and he panicked. He had both hands on the wheel and stood up on the brakes so hard that his body was straight. He immediately swerved to the right toward the ditch to miss the crowd. He saw a man running with his hands in the air making a flagging motion and, much to his regret, he struck him. After the impact, he scrambled to look behind him, and his feet hit the gas. His truck spun to the left, then to the right, and finally came to rest on a culvert.

Mr. Kelly testified that he could not see the lights from Sammy's as he approached the area that morning. He indicated that the fog was much worse at the time of the accident than what is depicted in the photographs taken after the accident and shown at trial. He testified that he had not passed Sammy's when he left work the day before on March 14, 2003, because traffic was being routed through Cheneyville. Upon inquiry as to why the traffic was being rerouted, Mr. Kelly was told that there had been a wreck.

The parties stipulated that if Bruce Graham, an employee of the DOTD, were called to testify, he would have stated that the DOTD had in its Marksville, Louisiana

7

office barricades, cones , channelizing barrels, and other devices that could have been placed on the road if requested. The DOTD did not receive such a request.

John Painter was offered by Plaintiffs and accepted by the trial court as an expert in accident reconstruction and police vehicle operations. He was unable to compute Mr. Kelly's speed with great precision because Mr. Kelly had tried to stop, briefly accelerated, and then tried to stop again. Taking into account the skid marks left by Mr. Kelly's tires and the dampness of the road due to the fog, he estimated that Mr. Kelly's speed was between fifty and fifty-five miles per hour. His measurements indicated that Mr. Kelly saw the people standing on the road ahead of him from 220 to 300 feet away, a distance farther than that testified by Mr. Kelly. He opined that the direction of the sun on the foggy morning of Mr. O'Quin's accident would have made it more difficult for Mr. Kelly to see the emergency lights ahead of him.

Upon cross-examination, Mr. Painter discounted the deposition testimony of George Schneider, a tow truck driver at the scene of the accident. Mr. Schneider was facing the interstate and could see Mr. Kelly's headlights at a distance of 1000 feet away as he drove under the interstate. Mr. Painter stated that Mr. Kelly's visibility could not be compared to that of Mr. Schneider's because Mr. Kelly was facing the sun and an array of vehicles ahead of him, not just looking ahead into the darkness.

Mr. Painter was of the opinion that Trooper Douglas's actions may have been reasonable for a lone responder during a low-traffic daytime accident; however, once he knew that the road would have to be closed for an extended period of time, he should have called for additional assistance. Trooper Douglas also should have moved his car at nightfall and done more to direct the traffic. Reflective cones or flares should have been used temporarily until the DOTD could arrive to help shut

8

down the roadway because after the fog appeared, visibility worsened, and motorists needed even more advance warning. Mr. Painter stated that another purpose of an advance warning area is to create a buffer zone to protect first responders at the scene from motorists unable to stop in time. He added that warning systems should be set up with reasonable expectations that some drivers will be speeding, fatigued, or drunk.

Mr. Painter concluded that the location of Trooper Douglas's vehicle at the time of the accident, embedded within non-police vehicles and facing away from traffic, was inappropriate for traffic control under the circumstances because it provided no warning and no buffer zone, both of which could have easily been provided, thus preventing Mr. O'Quin's death.

As a witness for the State, Kelly Adamson was accepted by the trial court as an expert in accident reconstruction and civil engineering. Mr. Adamson estimated that Mr. Kelly was going between sixty and seventy miles per hour before he began braking. After reviewing the deposition testimony of other people at the scene, Mr. Adamson was of the opinion that visibility was farther than what Mr. Kelly described.

Mr. Adamson concluded that the cause of the accident that killed Mr. O'Quin was Mr. Kelly's traveling too fast for the conditions. He opined that, in light of the fact that Mr. Kelly was a commercial vehicle operator, he should have known better because he had training with regard to how long it takes vehicles to stop.

On cross-examination, Mr. Adamson testified that he was contacted by the State regarding this case in December 2005, over two and one-half years after the accident. He received the depositions that he reviewed in forming his opinions just

9

three weeks before trial, and he did his latest inspection and survey of the accident site on the Sunday before trial.

## LAW

**Standard of Review**

It is well settled that a court of appeal may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). If the jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though it is convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.*

**Liability**

The legislature has vested law enforcement officers with exclusive authority to regulate traffic, and the public has a corresponding obligation to follow traffic regulations. *Blair v. Tynes*, 621 So.2d 591 (La.1993). "[O]fficers are duty bound to exercise this power reasonably to protect life and limb and to refrain from causing harm or injury." *Id.* at 596. Thus, when a law enforcement officer becomes aware of a dangerous traffic situation, the officer has an affirmative duty to see that neither motorists nor pedestrians are subjected to unreasonable risks of harm. *Id.; Monceaux v. Jennings Rice Drier, Inc.*, 590 So.2d 672 (La.App. 3 Cir. 1991). Moreover, this duty extends not only to prudent, attentive drivers, but also to those who are momentarily inattentive or careless, or even intoxicated. *Monceaux*, 590 So.2d 672.

"[M]otorists are charged with a duty of reasonable care to maintain a careful lookout, observe any obstructions present, and exercise care to avoid them. . . . [Nevertheless,] they have a right to assume that the roadway is reasonably safe for use

10

until they know, or should know, of an existing hazard." *Dupree v. City of New Orleans*, 99-3651, pp. 19-20 (La. 8/31/00), 765 So.2d 1002, 1015 (citation omitted).

In determining whether liability exists under the facts of a negligence case, the situation is analyzed using a duty-risk formula, in which the following must be considered: (1) whether the conduct of which the plaintiff complains was a cause-in-fact of the harm; (2) whether there was a duty on the part of the defendant which was imposed to protect against the risk involved; (3) whether there was a breach of that duty; and (4) damages. *Blair*, 621 So.2d 591.

**Apportionment of Fault**

The Louisiana Supreme Court has held that "[i]n determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985). The *Watson* court stated:

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Id.*; *see also, Johnson v. State ex rel. DOTD*, 06-898 (La.App. 3 Cir. 12/13/06), 946 So.2d 682, *writ denied*, 07-510 (La. 4/27/07), 955 So.2d 693.

The trier of fact's allocation of comparative negligence is a factual determination that is owed deference by the court of appeal. *Roberts v. Robicheaux*,

11

04-1405 (La.App. 3 Cir. 3/2/05), 896 So.2d 1232, *writ denied*, 05-792 (La. 5/13/05), 902 So.2d 1021. Therefore, a fault allocation should not be disturbed unless it is manifestly erroneous or clearly wrong. *Id.*; *Molina v. City of New Orleans*, 01-1411 (La.App. 4 Cir. 10/2/02), 830 So.2d 994, *writ denied*, 03-156 (La. 3/28/03), 840 So.2d 573.

## ANALYSIS

The State does not seriously contest the jury's implicit finding that Trooper Douglas owed a duty to Mr. O'Quin, an emergency responder, to protect him from an approaching motorist who might not realize that the road was blocked until it was too late to stop. In fact, the State framed the issue of law for this court to review as "[w]hether a motorist driving at a speed farther [sic] than his ability to see the road before him obscured by thick fog, and as a result of the speed striking and killing [an] emergency responder in the roadway is within the ambit of protection owed by the State Police." Rather, the State argues that the jury erred in assessing any fault to it, much less 80%, where the evidence supported a finding that Mr. Kelly was solely at fault for Mr. O'Quin's death.

Plaintiffs contend that they met their burden of proving that Trooper Douglas's conduct was a cause-in-fact of the harm suffered by the decedent; that the State owed a duty to protect emergency responders, such as Mr. O'Quin, from the risk that a speeding motorist, such as Mr. Kelly, would not have time to stop upon approaching the original accident scene; that Trooper Douglas breached that duty; and finally, that they suffered damages. In addition, Plaintiffs submit that the jury's allocation of fault acknowledged that Mr. Kelly bore some responsibility for the death of Mr. O'Quin, but it also properly recognized that the State should bear the lion's share of the fault

12

for breaching its duty to protect the scene. Plaintiffs submit that the fault allocation was fully supported by the evidence and, thus, is not clearly wrong.

**Liability**

We conclude that the evidence overwhelmingly supports the jury's conclusion that the conduct of the State was a cause-in-fact of the accident that killed Mr. O'Quin.

State Troopers have an affirmative duty, upon becoming aware of a dangerous traffic situation, to ensure that neither motorists nor pedestrians are subjected to unreasonable risks of harm. *Monceaux*, 590 So.2d 672. The initial chemical spill occurred in the daylight hours of March 14, 2003, nearly fifteen hours before Mr. O'Quin was killed. Trooper Douglas had almost twenty-three years experience as a road trooper at the time of this accident. Once it became apparent that the chemical spill could not be quickly removed, he was duty-bound to take additional measures to warn motorists using the roadway of the dangerous situation that they would be encountering. This is true because nightfall affects the visibility of roadway obstructions. Once fog entered the picture, the duty to provide additional warnings to motorists was enhanced and became even more important.

There were two other close calls at the scene in the early morning hours of March 15, 2003. Trooper Douglas testified that he feared for his own safety. It was stipulated that the DOTD had a twenty-four hour hotline that could be called to make requests for warning devices, such as barricades and barrels with flashing lights, that could have been placed on the road. Instead of ensuring that the site of the initial accident was secure and visible during the duration of the time necessary to clean up the chemical spill, so as to protect both motorists and emergency responders, Trooper Douglas embedded his vehicle among the other responder's vehicles. His conduct

13

amounted to a breach of the duty owed to Mr. O'Quin and damages occurred as a result.

**Apportionment of Fault**

The issue at the heart of this appeal is whether the jury's apportionment of fault between the State and Mr. Kelly was manifestly erroneous or clearly wrong.

The thrust of the State's argument in favor of this court increasing the jury's allocation of 20% fault to Mr. Kelly is that he should have slowed down due to the fog and limited visibility on the morning of the accident and that his failure to do so was the sole cause-in-fact of the accident. No case law is cited in support of the State's argument.

Plaintiffs counter that application of the *Watson* factors reveals that the jury's fault allocation took into account the nature of the conduct of Trooper Douglas and Mr. Kelly and was consistent with Louisiana law governing fault allocation. In arguing that the jury's allocation of fault is fully supported by the law and evidence, and is, thus, not manifestly erroneous or clearly wrong, Plaintiffs rely on *Campbell v. La. Dep't of Transp. & Dev.*, 94-1052 (La. 1/17/95), 648 So.2d 898.

In *Campbell*, a single-car accident occurred when the driver fell asleep at the wheel and his automobile struck a bridge abutment, resulting in the death of a passenger and injuries to the driver and another passenger. Following a bench trial, the trial court found the driver 25% at fault and the DOTD 75% at fault for causing the accident and resulting injuries. On appeal, this court amended the judgment to reduce the liability of the DOTD from 75% to 10%. The Louisiana Supreme Court reversed and reinstated the trial court judgment. In doing so, the court analyzed the fault of the

14

parties in causing the *harm* to the plaintiffs, finding it clear that the greater degree of fault lied with the DOTD under the circumstances of that case. The court stated:

> [E]xcept to the extent that the driver's negligence set the accident in motion, the driver had no control over the resulting harm caused by the impact of the vehicle with the concrete bridge abutment. The evidence presented by experts on both sides was that the purpose of a guardrail is to prevent or at least reduce the injuries and subsequent damage by redirecting a vehicle back onto the highway and to prevent impact with the concrete bridge abutment. . . .To put it another way, [the driver's] negligence set the course for an accident to happen, but the harm or injuries to the guest passengers in [the driver's] vehicle were a direct result of the impact with the concrete bridge abutment. We agree with the trial judge's finding that the DOTD's fault is more substantial than the fault of [the driver] in causing the harm sustained.

*Id*. at 902-903.

Plaintiffs submit that while Mr. Kelly's conduct set the accident in motion, had the State properly secured the scene and warned approaching motorists of the dangerous condition ahead and created a buffer zone, the first responders would have been in a protected zone. Plaintiffs suggest that while Mr. Kelly's conduct would have perhaps resulted in property damage, it would not have caused the death of Mr. O'Quin.

**Application of the *Watson* Factors**

The first *Watson* factor asks whether the conduct resulted from inadvertence or involved an awareness of the danger. Trooper Douglas had been at the chemical spill site for over ten hours before Mr. O'Quin was killed. He had nearly twenty-three years experience as a road trooper when this accident occurred. He knew that the road was going to be blocked for a long time. He had encountered many dangerous traffic situations in the past. He was aware that the DOTD could provide him with barricades and barrels with flashing lights to give warning to approaching motorists of the dangerous traffic situation that they were about to encounter. He saw the fog roll in

15

overnight and remain throughout the morning. He knew that there were several close calls that morning where emergency responders had nearly been hit. He had even moved his vehicle because he feared for his own safety. We conclude that Trooper Douglas was, or clearly should have been, acutely aware of the danger. In contrast, Mr. Kelly was admittedly going faster than he should have been under the circumstances, but he was unaware of the danger ahead of him, i.e., the road's closure and the close proximity of emergency personnel, because he had not be properly warned of its existence.

The second *Watson* factor questions how great a risk was created by the conduct. Trooper Douglas knew that the risk of a second accident was high, especially once the fog rolled in, because the chemical spill site took up the entire roadway. He knew that the first responders were using the area around Mr. Blanchard's Oil Mop truck as a staging site, and that those responders expected to be in a zone of protection while they worked to clear the chemical spill. Being an experienced road trooper, Trooper Douglas also knew that some motorists would be traveling faster than what they should have been given the weather conditions. Mr. Kelly's speed was such that he might be unable to stop his vehicle in time should he be confronted with an emergency.

The third *Watson* factor inquires into the significance of what was sought by the conduct. Trooper Douglas was in charge of traffic control at the scene. He was duty-bound to protect and secure the initial accident scene and to make sure that motorists and pedestrians were not subjected to unreasonable risks of harm. That duty required him to anticipate inattentive drivers and drivers who were exceeding the speed limit. Despite fearing for even his own personal safety, Trooper Douglas failed to adequately

16

mark the initial accident scene so that motorists would be forewarned of the dangerous traffic condition ahead of them. Mr. Kelly was trying to get to work the morning of the accident. He had a duty to maintain a proper lookout for hazardous conditions and to maintain control of his vehicle.

The fourth *Watson* factor examines the capacity of the actors, whether superior or inferior. Trooper Douglas was a long-time state trooper who was trained in proper traffic control and advance warning procedures. Mr. Kelly was a trucker on his way to work in his personal vehicle, traveling a route that he knew well.

The final *Watson* factor inquires into whether there were any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Trooper Douglas had many hours to assess and re-assess the situation. In addition, he had many years of training and experience in handling dangerous traffic situations upon which he could rely in developing a traffic control plan customized to the particulars of the situation before him. In contrast, Mr. Kelly suddenly saw something ahead of him in the fog and had only seconds to process what he was seeing and how he was going to react.

Application of the facts of this case to the *Watson* factors overwhelmingly reveals that the State should bear a significant portion of the fault in this case.

In addition, we agree with Plaintiffs' contention that while Mr. Kelly's conduct set the accident in motion, Mr. O'Quin would likely have escaped injury had the State fulfilled its duty of properly securing the original chemical spill site and adequately warning on-coming motorists of the dangerous traffic situation ahead. This weighs in favor of assessing more fault to the State.

17

Plaintiffs presented more than ample evidence, including the testimony of an expert witness, to support their claim that the State should bear the majority of the fault for the accident that killed Mr. O'Quin. We conclude that the jury's allocation of fault in this matter was neither manifestly erroneous nor clearly wrong.

## CONCLUSION

We have carefully reviewed the record and have found no error in the jury's finding that the conduct of both the State and Mr. Kelly was a cause of the accident which resulted in the death of Mr. O'Quin. Likewise, our review of the record reveals no error in the jury's allocation of fault between the State and Mr. Kelly. The judgment of the trial court is affirmed. The State of Louisiana, through the Department of Public Safety and Corrections, Louisiana State Police, is cast with all costs of this appeal.

**AFFIRMED.**